# WINDSOR COUNTY.

ADJOURNED TERM, HELD IN JUNE, 1841.

PRESENT, HON. CHARLES K. WILLIAMS, *Chief Justice.*
    "    STEPHEN ROYCE,
    "    ISAAC F. REDFIELD,   } *Assistant Justices.*
    "    MILO L. BENNETT,

MARY ALMIRA CLARK, survivor of JEREMIAH CLARK, *v.* ROSWELL M. FIELD.

*(In Chancery.)*

A court of chancery, by virtue of their ordinary equity jurisdiction, may decree a marriage ceremony, performed before a justice of the peace, or minister of the gospel, null and void, if the consent of the parties was not voluntarily given.

Where a marriage ceremony was had under a mistake of one of the parties, as to its legal effect, and it was not, and was not intended to be, followed by co-habitation, without a future public marriage ceremony, and was not consummated, the court of chancery decreed it null at the election of one of the parties.

THIS was an appeal from a decree of the court of chancery, annulling a ceremony of marriage between the oratrix and the defendant. The bill was filed by Jeremiah Clark and Mary Almira Clark, formerly Mary Almira Phelps. The said Jeremiah having died after the filing of the bill, the suit proceeded in the name of the said Mary Almira, as survivor.

The complainants, in their bill, after stating a pre-contract between the complainants, set forth and charged, among other things, that a ceremony of marriage was performed at Putney, Vermont, on the fifteenth day of October, 1832, between the said Mary and the defendant; that said ceremony was procured by circumvention, fraud, force, and violence on the

part of the defendant, aided by the acts and practices of others, who were his confederates ; that the consent of said Mary thereto was *apparent,* only, having been extorted by violence and fear ; or that if her consent were real, it was procured by fraud and circumvention ; that the ceremony was performed on a condition that it should be a nullity unless she should subsequently elect to consider it valid, in which case another and legal marriage was to be had ; that there had been no consummation of the pretended marriage, and that the complainants afterwards intermarried, in pursuance of their pre-contract. And the complainants prayed that said pretended marriage might be decreed null and void, by reason of said pre-contract and of the fear, violence, fraud and circumvention charged in the bill, and for such other and further relief as to the court might seem meet and proper.

The answer of the defendant, among other things, contains an admission that the defendant was aware of the alledged pre-contract between the complainants, previously to said marriage ceremony at Putney ; but the defendant denied all fraud, &c., and insisted that his marriage with the said Mary was valid, and was had by and with her full consent, and that she was his lawful wife.

The answer was traversed, and testimony was taken.

The substance of so much of the testimony as is deemed material, as well as other matters alleged in the bill and answer, sufficiently appear in the opinion of the court.

*A. Aikens,* for oratrix, insisted that a decree of *nullity* of the pretended marriage between the defendant and Mary Almira Phelps, ought to be PRONOUNCED :—Because,

1. The ceremony was a nullity.

No marriage was *intended* by it *between the parties.*

Not having been followed by cohabitation, or consummation, and having been *had* contrary to the provisions of the statute, it is VOID ;—1. As *against* the statute. 2. As *contrary to sound policy.*

2. If the court find a marriage *in fact,* (i. e.) if the ceremony was had with the *mutual agreement* and *intent* of the parties, that *it* should be THE *marriage ;*—then, (as it was not followed by cohabitation,) it is *voidable;* by reason of the *pre-contract,* and ought to be *annulled.*

WINDSOR,
June,
1841.

Clark
v.
Field

But if the court find this ceremony a legal marriage, and no cause for pronouncing a decree of nullity ; *then, under the circumstances,* we ask a decree of the court ;

- 1. That the whole paternal estate of the oratrix may be placed in the hands of trustees :—1. To defray the expenses of the suit. 2. For the support of the oratrix and her children.

2. That Field be perpetually enjoined from commencing and from further prosecuting any and every suit against each and all persons whomsoever, for the recovery of the possession of her property, or any part thereof.

*C. Coolidge,* for defendant.

In discussing this case, it is to be preliminarily noted that the complainants can derive no aid from our law regulating marriage and divorce. The act of 1797 declares two disabilities to marry, which are, the being within the degrees there mentioned, and the having a wife, or husband, living, and not divorced. Neither of these were attached to the defendant, nor to the complainant, Mary. Both were of the age of legal discretion and consent to marry. It results that the parties were *able* to contract, unless restrained by the common, in other words, the canonical law. Whether any canonical disability, out of the statute, exists in this state, in persons of competent age to understandingly consent, may be hereafter considered.

The parties must be *willing* to contract. *Consensus, non concubitus, facit nuptias.* Bl. Comm. vol. 1, p. 434.

Consent to a contract of marriage *de presenti,* renders the marriage valid without any other act. *Dalrymple* v. *Dalrymple,* 2 Haggard's Cons. R. 54, 81. *Milford* v. *Worcester,* 7 Mass. R. 48. *Londonderry* v. *Chester,* 2 N. H. R. 268. *Fenton* v. *Reed,* 4 Johns. 52. *Benton* v. *Benton,* 1 Day's Cases, 111. 2 Kent's Comm. 86, &c.

1. The bill charges, that the consent of the complainant, Mary, to the marriage, was *apparent,* only, having been extorted by violence and fear ; or that, if the consent were real, it was procured by fraud and circumvention.

Against this, the defendant insists that his marriage with said Mary was had with her free and full consent, for confirmation of which he refers to the evidence. Were there

room for any pretence of practice upon the credulous nature of the party, still, the law makes no provisions for the relief of a blind credulity, however it may have been produced. Potier, § 310, 314. 2 Haggard (above cited), 248. 1 Day's Cases, 111. 2 Kent's Comm. 67.

2. The bill charges, that the ceremony was performed on *condition* that it should be a nullity unless she should subsequently *elect* to consider it valid, in which case another and legal marriage was to be had.

The defendant contends that there cannot be any condition whatever annexed to a ceremony of marriage. It is a union of the parties, or it is nothing. It is, in such a case, a legal solecism to say, as is averred in the bill, that it was had " on the condition that it should be a nullity" at her election. For if it were a nullity, it was such *then*, and no subsequent choice or assent could set it up as valid. Nor upon any legal principle, or natural right, can there be a contract between parties of competent age to bind themselves or not, at the election of one only of the contractors. Both are bound, or neither.

But nothing appears to give evidence of a stipulation for ratifying the marriage by her subsequent choice. The only unusual circumstance attending the transaction was, that, at *her* request, it was to be concealed from her friends until she should, as she engaged soon to do, disclose it confidentially to them ; and then a *public* ceremony, if desired, might pass, to save them the mortification of a clandestine marriage.

3. The bill alleges want of consummation.

That this constitutes no ground of nullity, see the case of *Dalrymple* v. *Dalrymple* (above cited). It would make *that* a test of marriage which one of the parties might employ, against the will of the other, and thus violate the most implicit and sacred of all trusts. Besides, the investigation of such subjects would tend to gross impurity as well as fraud, and could not be endured.

4. The pre-contract between the complainants, is assigned as cause for the decree prayed for.

The disability arising from pre-contract has long since ceased to exist in the English law, having been virtually pre-

cluded by statute many years before our adoption of the common law. 1 B. Comm. 435.

It had its origin in papal ususpation. Upon the Reformation, marriage, in respect of its civil rights and duties, was kept in hand by the common law courts ; but, being regarded by both papists and protestants as a religious rite, it was, in relation to its moral character, incidents and consequences, left to the control of the ecclesiastical tribunals. These tribunals, acting upon the principle that a contract *per verba de presenti tempore* was, spiritually, or holily, actual marriage, [see 4 Coke, 29,] upheld the impediment of pre-contract until the 32 Henry VIII, when it was abolished,—was revived in 2 and 3 Edw. VI, and finally extinguished in 26 Geo. II. See Bl. Comm. (last above cited). It is believed that not a single case can be found, for nearly a century, in either England or this country, wherein it has been recognized. Such a disability is against social policy. It would be an oppressive restraint, and tend to the subversion of pure morals. We have no fear that it will be revived until another ecclesiastical despotism shall overshadow the world.

It is unnecessary to discuss the question, whether the English canon law is part of the common law as adopted by this state, since none of the disabilities alleged in the bill pertained to the former, at the founding of our government. It will not, we think, be contended that the canon law, as a code, is in force here for any purpose whatever. Our marriage act was passed in February, 1797 ; the act adopting the common law, in November, 1797.

The several grounds of disability assumed in the bill have been thus briefly adverted to for the reason that neither of them, if true as a fact, furnishes any basis for the decree sought for. It is, therefore, insisted by the defendant,

1. That this court cannot decree a marriage null and void for any impediments other than the two prescribed by statute.

2. That it can interfere in this case only by virtue of its general equity jurisdiction over the subject, regarded as a civil contract.

3. That to warrant a decree of nullity, the court must find the contract to have been void by reason of fraud.

Relying on these points, the defendant contends that

the proofs yield no evidence of the facts required to sustain the bill.

The opinion of the court was delivered by

WILLIAMS, Ch. J.—This case comes before us on an appeal from a decree made by the Chancellor of the second judicial circuit, declaring " that a certain ceremony of marriage, heretofore had between the oratrix, Mary Almira Clark, and the defendant, Roswell M. Field, before Asa Keyes, 2d., Esq., be and was and is null and void, and of no effect or binding force whatever, either in law or equity, and that the same be henceforth so held and considered." The object of the bill was to declare the ceremony of marriage null on several grounds or reasons, but principally because it was not intended as a marriage, at the time, unless afterwards consented to ; was procured by fraud ; and was not followed by consummation or cohabitation, and that theoratrix was previously engaged and betrothed to Mr. Clark, whom she afterwards married. Mr. Clark joined with her in bringing this bill, and has deceased since the decree pronounced by the Chancellor.

*In limine*, an objection is taken to the jurisdiction of the court of chancery over contracts in relation to marriage, and its power to pronounce a sentence of nullity on a marriage ceremony, pronounced or solemnized before those persons who are authorised to solemnize marriages in this state. We, however, are satisfied, that the court of chancery, under its common equity jurisdiction, may rescind, or relieve against a marriage contract, or annul a contract solemnized before a magistrate or a minister of the gospel, if obtained by force, fraud or imposition, or under a mistake as to the legal effect of such solemnization by one of the parties, if the other party knew the legal effect, and also knew that the party was under such mistake, when such ceremony has not been followed by consummation or cohabitation. Even, when followed by consummation, there may be extraordinary cases of fraud and imposition, which require the aid of the court of chancery to prevent consequences in a high degree disastrous, if that aid was not afforded. Our law regards marriage as a civil contract, valid and binding where the parties are able and willing to contract, and actually do contract.

in such forms and ceremonies as are or may be made by law essential to the validity of the marriage. There is no tribunal existing here, or elsewhere, to compel the celebration of a marriage contract. The ecclesiastical courts of England formerly could compel a celebration of marriage, *in facie ecclesiæ*, when a contract had been made between persons competent to contract. But this power is, and has been for nearly a century, abolished in Great Britain by statute, and has never been claimed as existing in nor exercised by any tribunal in this state. And indeed the exercise of such a power is wholly inconsistent with the nature of the marriage contract, which must take effect from pure voluntary consent of the parties, declared before the proper officer at the time it is solemnized. To compel parties to take the marriage vow, when their consent is given by coercion, and is not voluntary, is to require them to be guilty of palpable prevarication and falsehood, equally at war and inconsistent with the dictates of law, morality and religion. It is sufficient that for the breach of this engagement the law allows the party aggrieved to recover a compensation in damages against the one who wantonly, and without any justifiable cause, disregards an engagement deliberately made, and which should have been duly and deliberately considered before entered into.

Considering marriage as a civil contract, it would seem to be subject to the jurisdiction of the ordinary courts of law and equity, in the same manner as other contracts, with only such differences as to the nature and forms of the remedy, and the time and place proper for the exercise of that jurisdiction, as would arise from the nature and design of the contract. In England, where cognizance of matrimonial causes is given to the spiritual courts, we have noticed that the performance of a contract of marriage could formerly be enforced in the spiritual court; yet, the courts of common law had also a jurisdiction to give damages for the breach of such contract, and, by commencing an action at common law, the remedy in the spiritual court was actually released. Courts of law have the power of deciding directly upon the fact or legality of a marriage when it comes collaterally in issue. They have disregarded or considered as void a marriage, although evidenced by a record from a justice of the

peace, or a minister of the gospel. In the case of *Middle-* borough v. *Rochester,* 12 Mass. 363, evidence was given to the jury that a man who had been married by a minister of the gospel, when the intention had been published, was a *non compos mentis,* and a verdict was found that the marriage was not valid ; and in the case of *Mountholly* v. *Andover,* 11 Vt. R. 226, it was proved that a marriage ceremony was had before a justice of the peace, without the consent of the parties, but by the constraint and coercion of others, and the marriage was found to be invalid. If a marriage ceremony can thus be impeached, collaterally, there is a much stronger reason why there should be some competent tribunal to inquire into and pronounce a decree of nullity on a marriage ceremony, performed without consent of the parties, and procured either by force or fraud. The jurisdiction over all matrimonial questions and causes, originally, I apprehend, appertained to the courts of law and equity ; but, for reasons which do not now exist, the jurisdiction was either given to or assumed by the ecclesiastical courts. We have no such courts here. The supreme court was authorized to grant bills of divorce only for certain causes, and had no power, at the time this bill was filed, to pronounce a sentence of nullity on a marriage void for want of consent. The necessity of such a jurisdiction is apparent, and we apprehend that it falls within the ordinary equity jurisdiction of courts of chancery to relieve against contracts obtained by fraud, or where one or both of the parties were deceived.

This question of jurisdiction has been examined in the state of New York, and the results, to which the courts of that state have arrived, are perfectly satisfactory to us. In the case of *Aymar* v. *Roff,* 3 Johns. Ch. R. 49, where an infant, of twelve years of age, was married, being ignorant of the duties which a marriage, if legal, would impose, the Chancellor ordered her to be placed under the protection of the court, as a ward, and forbade the husband all intercourse or correspondence with her. In the case of *Wightman* v. *Wightman,* 4 Johns. Ch. R. 343, the learned Chancellor examined the question of jurisdiction very fully, and came to the conclusion that it was in the power and was the duty of the court to declare void the marriage of a lunatic, and accordingly did so decree and declare the parties free from the

Windsor,
June,
1841.

Clark
v.
Field.

obligations of marriage with each other.    In the case of *Ferlar* v. *Gojon*, 1 Hopk. Ch. R. 478, Chancellor Sanford asserts the jurisdiction of a court of equity over contracts of marriage, when obtained by fraud, and says, very emphatically, that " the jurisdiction of equity in cases of fraudulent ' contracts seems sufficiently comprehensive to include the ' contract of marriage.   And although it may be a new ap-' plication of the powers of the court, I do not perceive that it ' is an extension of its jurisdiction."   Indeed, it would be very singular, if the court may relieve against all other contracts obtained by fraud or imposition, and could not relieve from this contract, when obtained by such means, when the consent was not given understandingly, and the marriage was not consummated.   We are entirely satisfied of the power and jurisdiction of the court of chancery to pronounce a sentence of nullity on a marriage illegally had, and to give relief in this and all similar cases, when the evidence requires that it should be done.

In the case before us, it is unnecessary and inexpedient to recapitulate the testimony, or to state all the facts to which testimony has been given.   In relation to a transaction which was calculated to call up exasperated feelings, which has apparently taxed ingenuity and genius to criminate and recriminate, where a deep sense of injury is evidently felt and expressed by the parties to this controversy, and where this state of feeling has extended, as it was to be expected, to all the immediate friends of the parties, who, from their situation, were necessarily compelled to become witnesses and to testify in the case, it could answer no good purpose for the court to repeat all the statements which they have made in their depositions, to compare them one with another, and declare what parts of the testimony are to be received or rejected.   It is sufficient to say that we have examined all the testimony critically, and to state what facts we consider as proved, so far as they are to have any effect on the decision which we are about to make, trusting and believing that all the witnesses have intended to give a true and faithful relation of every part of this case which came under their personal observation.

It appears that the oratrix arrived at the age of eighteen on the 12th August, 1832 ; that a mutual affection had for

some time existed between her and Mr. Clark, who joined with her in bringing the bill, and that they had been mutually engaged and betrothed to each other. On or about the 22d August, she made a visit to Mrs. Bradley, at Brattleboro', who had been her intimate friend and acquaintance, and an adopted daughter of her mother. She remained at Brattleboro' and in its vicinity until the 15th of October following, and during this period she became acquainted with the defendant, Field, who knew of her engagement to'Clark. During all this time she corresponded with Clark, and on the 6th of October wrote him an affectionate letter, not betraying any change of feeling or affection. It is however apparent that her attachment to Clark was greatly weakened, if not effaced, before her return to Windsor, and that she was apparently pleased with the society of Mr. Field, and not reluctant to receive his attentions. How far it was consistent with the rules of propriety and morality, for the defendant, knowing of her engagement, to address her, or for her to receive his addresses, does not belong to this court to decide. In law he was at liberty to marry her, and she to marry him, but answerable for the breach of any former engagement. It appears that rumors had reached the ear of her mother, at Windsor, who required her immediate return. On Sunday evening, the 14th of October, the night previous to her return, she had an interview with the defendant, Field, at the house of Mr. Bradley. The account given of this interview by the oratrix in her bill, and by the defendant in his answer, are different, *toto cœlo*. Probably, during this interview, a contract of marriage between them was signed by the defendant ; he admits in his answer that the oratrix had in her possession a paper writing, signed by him, purporting to be a contract or acknowledgment of marriage between them, and says it was executed on the 14th day of October, when it bears date ; and; in his answer to a bill filed in the circuit court of the United States, in the district of Massachusetts, he says that he wrote some sort of contract, agreement or acknowledgment of marriage, dated the 14th of October, to which he affixed his own sign-manual, and put it into her hands, but he believes she did not in fact sign it. This, it is to be noticed, bears date the same day when the interview was had which I have mentioned. On Monday morning,

the 15th of October, the oratrix and the defendant, Field, were at Mr. Bradley's, and she was about to go to Windsor, accompanied by Mr. Bradley.    At this time, according to the testimony of Mr. and Mrs. Bradley, both were in a high degree of excitement, wholly inconsistent with the cool deliberation and reflection, with which a connection for life should be formed.    The oratrix insisted on being then married to the defendant, and this was only prevented by the determination of Mr. Bradley not to marry them, and the refusal of Mrs. Bradley to have them married at their house by any other magistrate.    She    then    left    Brattleboro' with Mr. Bradley, and, having made a stop at Dummerston, they came to Putney, about ten miles from Brattleboro', where the marriage ceremony was performed, which it is the object of this bill to annul.    Mr. Bradley says that, before they left his house, they formed the determination to be married at the stage-house in Putney ; he says further that he does not recollect that any distinct proposal was made by the defendant to him and the said Mary Almira, that the marriage should take place at Putney, but as he withdrew all further opposition, they apparently understood it as an act of assent on his part.    Immediately after the ceremony took place, the defendant went to his residence at Fayetteville, and the oratrix, with Mr. Bradley, returned to the residence of her mother in Windsor.

On her arrival at Windsor, nothing was communicated to her mother or friends in relation to the marriage at Putney, nor was the marriage at that time made public, or intended to be made public. It was therefore to be expected that they, knowing of her engagement with Mr. Clark, and having heard rumors of her having received attentions from Mr. Field, inconsistent with that engagement, should have urged upon her the propriety of fulfilling it. Nor is it a matter of surprise, and certainly not a reason of complaint, that they should strenuously have urged and insisted on this, when the state of her affections for the defendant, and the extent of her engagement to him, were studiously concealed from her mother and friends.    It appears further that on her arrival home, she wrote to the defendant, and on the next day to Mr. Clark.    From her letters to Mr. Field, on the 15th, 21st, and 28th October, it would appear that she    entertained    a

strong affection for him, and probably viewed him as the husband with whom she should thereafter live, although the last letter does not breathe the same affection as the former ones.    But on the 29th of October she wrote to Mr. Clark, then at Boston, a very pressing letter, urging him by motives which could not but be powerful, to come immediately to Windsor, and on the first day of November Mr. Clark arrived.    On the morning of the next day, for the first time, the communication of what had taken place at Putney is made by her to her mother, and her brothers and sisters, together with her views of the nature and intent of that ceremony, which will be noticed hereafter, and on that day she wrote to the defendant the following letter, which she sent by Judge Aikens:

" To Mr. Roswell F.

    ' Sir,—Moments of consideration and much reflection have
' at length caused me to see in its proper light the whole of my
' late visit to Brattleboro'.    That I have been led by you and
' others to a course of conduct which my own reason, sense
' and feelings entirely disapprove, is now very clear to me.  I
' therefore write this to say to you that I am not willing on
' any account, to see you again, neither will I by any course
' you can adopt, be prevailed upon to view the matter in a
' different light from what I now do.    I leave you to the al-
' ternative of forever preventing the public avowal of a dis-
' graceful transaction, of which you yourself said you were
' ashamed.                                    MARY A. P."

    On the 6th of November she addressed another short note to him, assuring him that the letter sent by Judge Aikens contained her real sentiments, and on the 27th of the same November she was married to Mr. Clark.

    From this history of the case, and from an examination of the evidence, it is to be decided what was the intent and nature of the ceremony at Putney ; for, if it was intended to be a marriage between them, the present bill must be dismissed, however unfortunate and disastrous it may be to all the parties.    The marriage with Clark was followed by the birth of issue in the September following.    If the marriage at Putney is legal, she was an adulteress, and the defendant, possessing those honorable feelings which are attributed to him, could not live with her or receive her as his wife.  He could

have no other than a strict legal right to be considered as her husband, and a similar right to whatever of her property may re-remain, subject to the consideration of the court, whether any part should be secured for her maintenance. As Clark has died pending this suit, it cannot now be claimed that she is living in adultery with him. These consequences, however, cannot vary the testimony nor alter the facts, and upon them we must found our decision, leaving the parties to the consequences of their own actions, whether for good or for evil.

The evidence is satisfactory to us, that the parties did not, by the ceremony at Putney, intend a marriage, so far as we can learn their intentions from the testimony, and by their acts and conduct. How she viewed it, is beyond controversy. She was at the time undoubtedly sincere, intending to dismiss Clark and at a future time to receive Mr. Field as her husband, though it is apparent both from her letter to Mr. Field on the evening of her return to Windsor, and her letter to Clark on the following day, as well as her conduct that evening and morning, that she felt unpleasantly. She does not appear to have been fully acquainted with the legal consequences of a solemnization of marriage until the conversation with her brother, Francis E. Phelps, on the morning of the second of November. It is inconceivable that she should have remained so long silent, and particularly that she should have written to Clark so pressingly to come up to Windsor, if she fully believed that she was lawfully the wife of another. How she declared it was to be considered, we learn from the testimony of her brothers, her sisters and her mother. Francis E. Phelps says that early on the morning of the second November, she informed him of the transaction at Putney, and told him that the defendant said if she would cheerfully go forward and stand up before a magistrate she might then go home, and after she got home she might then make her election, and, if she concluded to have Field, she could dismiss Clark, and Field could come up, court her, and be married. She said, further, " she had told Clark all but the Putney affair, and he had forgiven her." He further testified that she wanted him to tell them that she chose Clark, and did not want to have any thing to do with Field. She gave the same account to her mother and to Mrs. Emerson, her sister, saying, in talking of the transaction at Putney, that *it*

*was never intended to be a marriage.* When her brother, Francis E. told her that, if it was a marriage, she must live with Mr. Field, she burst into tears, wrung her hands and said the ceremony at Putney was nothing, and that "Mr. Field would say so." Mrs. Emerson says that when she met Clark that morning, at her house, he observed that Almira *thinks* she is married, but it cannot be so. This remark of Mr. Clark may have arisen, and probably did, from the information he derived from her brother, Francis E. Phelps, as, in the conversation Almira had with him early that morning, she said she had told Mr. Clark all but the *Putney affair.* So far as her declarations and conduct afford any indication of the light in which she viewed the ceremony at Putney, it is, as I have already remarked, undeniable that she did not consider it as a marriage, but in the nature of an engagement, preparatory to a marriage to be thereafter had. Yet these are but the declarations of the oratrix and they are denied in the answer; of course, they must be substantiated by other evidence, or they are to pass for nothing. On examining further the testimony of Francis E. Phelps, we learn that after the letter was sent by Judge Aikens, on the second of November, the defendant came to Windsor, and, among a variety of other things which took place there, the witness says, that, during the stay of the defendant at Windsor, "I had some hours conversation with him with respect to 'the matters aforesaid, during which conversation I related to 'him Almira's history of the affair, as stated in my answer to 'the third direct interrogatory, avoiding any implication of 'Mrs. ———— and Mrs. ————. Field admitted that the 'account which *Almira has given of the Putney affair of* '*the pretended marriage was true,* and Field said that he 'and the said Mary Almira did agree *that if she should elect* '*to have him,* he was to come up and court her and be 'married, and he had calculated so to do.' And, in answer to one of the cross interrogatories, he says, "that he," Field, 'did not at any time apprise me that the said ceremony of 'marriage was regarded by him as valid and legal and would 'be so treated; but stated that her (Almira's) account of said 'ceremony, as represented to him by me, was correct, and 'that it was his calculation to come up and court her and be 'married." And, he further says, that he never understood

Windsor,<br>
June,<br>
1841.
<hr>
Clark<br>
*v.*<br>
Field.

from the said Mary Almira and the said Field that the ceremony was of any validity whatever, or that it was so to be considered. In the conversation which the defendant had with Judge Aikens, on the third of November, there appears some caution and wariness on the part of the defendant, probably for reasons satisfactory; but we learn, from the testimony of Judge Aikens, that he communicated to Field that Mary Almira had declared that a ceremony of marriage was had between Mr. Field and her, and, in answer to a cross interrogatory, he says, very positively, that he expressly told Mr. Field that the family had learned from Mary Almira herself that a ceremony of marriage had been had at Putney, and that he came to Mr. Field to learn the true character of that ceremony, at the request of her family and friends. The defendant told him that, "whatever was the actual state ' of his connection with her, it was in her power to say what ' the end of it should be." And when Judge Aikens afterwards remarked to him that he should be glad of some more definite information from him, he replied, " it rests with her ' to say whether the thing ends where it is, or not; her ' destiny is in her own hands." He testifies further, that ' the said Field, in his interview with me, did, more than ' once, reiterate the declaration, in substance, that the said ' Mary Almira was free to act as she pleased." And when, at a subsequent time, Judge Aikens remarked to him that, as no marriage had been or would be recorded, and if in fact it was only intended as a ground of assurance between them that they would in future be married, it was not a violation of any principle of morality to let it pass like any other promise of marriage which the parties might, if they saw fit ' abandon at pleasure, Mr. Field " did not pretend that there ' was any thing in the real character of the transaction that ' rendered it either unlawful or immoral to take that course, ' but expressed some vexation at the scandal to be appre- ' hended." The testimony of both these witnesses shows an admission or assent of the defendant that the relation of the oratrix, as to the nature, character and intent of the ceremony of marriage performed at Putney, was correct, or, at least, that it was so understood by her from her conversation with him at some of the interviews between them, and hat the defendant knew that such was her understanding

and view of it. This is also corroborated by the conversa-
tion which the defendant had with Mr. Keyes, the magistrate
who married them, when he spoke of the marriage being
kept secret and that it might become proper to have a public
ceremony of marriage at Windsor, which induced Mr. Keyes
to ask him if he wished him not to record the marriage.
Mr. Bradley relates that, in the earnest and impassioned con-
versation at his house, while they were urging Mr. B. to
marry them, and when the defendant wrote the certificate of
marriage and requested her to sign it, the oratrix said her
mother was not to know it; they were going to be married
over again in a public manner. The suggestion of Mrs.
Bradley, in her letter of the fifth of November, to the oratrix,
of the possibility of a wedding, as Mr. Clark was then at
Windsor, and about sending a piece of cake, is worthy of
some consideration, as she heard, from the defendant, of
the marriage ceremony at Putney the day it took place.
The correspondence between the oratrix and the defendant
indicates some doubt, at least, on her part, whether she
should be able to dismiss Mr. Clark, and, in the letter of the
defendant to her, after he had received hers by Judge Aikens,
and was fully apprised that the fact of the marriage ceremony
had been made known to her friends, he does not' address
her as his wife, but expresses his fears that she may yet be-
come the wife of another.

On an examination of the whole case, we come to the
result that the ceremony at Putney was not intended as a
marriage, *in presenti*, to be followed by consummation and
cohabitation thereafter, without some future act or ceremony
of marriage, or at least, that it was not so understood by her,
and it was known to him that such was her understanding,
and this is enough to decide the present case. It is true,
*"consensus, non concubitus, facit nuptias."* The con-
sent, however, in this state, must be declared before one
authorized to solemnize a marriage, with a present intention
to be husband and wife, by that solemnization, and, *usually*,
with the intention of cohabiting together thereafter as
husband and wife, in pursuance of the vows pledged at the
time. This we do not consider was the case with these
parties, and that it was viewed in no other light than in the
nature of a promise or engagement which they meant to

perform and fulfil. This being in violation of her previous engagement to Clark, she having repudiated the ceremony as binding, and declared her election to consider it a nullity, and having since intermarried with Clark and cohabited with him, we consider that it was not a valid marriage between the oratrix and the defendant, and the decree of the chancellor, declaring that ceremony null, should be affirmed.

It may be proper to add that we are not disposed to animadvert on the conduct of the parties, or of their respective friends and connections, nor to pronounce any opinion further than is required to show the grounds of our determination. The immediate parties may find some excuse or palliation in the thoughtlessness of youth, the strength of affection, the pangs of disappointed and blighted hopes, in versatility of feeling to which all are subject, and in constitutional temperament. The conduct of the friends of either is not to be judged of, nor censured, in consequence of the unfortunate results which have attended this truly unfortunate case. In judging of the past transactions of others, which have terminated either favorably or unfavorably, we are very apt to say that a different course was required and would have produced a different effect. But who can say what would have been the inevitable consequences of a different line of conduct by the friends of either party? The infatuation and the determination of the parties to pursue that course, which was most agreeable to their own feelings and views, placed their friends and acquaintances, at the time, in a very unpleasant situation, and it would be wrong for us now to say that they were not actuated by good motives, and did not pursue that line of conduct which they thought, at the time, duty dictated. We inquire not as to the conduct of others, we censure them not, nor do we say any thing as to the parties before us, except what has been thought necessary in deciding the case.

The decree of the chancellor is affirmed.