MONA CARTER MILLER, Claimant and Respondent, CHARLES D. CARTER, Deceased, v. TOWNSEND LUMBER COMPANY, INC., Employer, and PACIFIC COMPENSATION COMPANY, Insurance Carrier, Defendants and Appellants.

No. 11230.
Submitted November 22, 1968. Decided December 5, 1968.
448 P.2d 148.

Patrick F. Hooks (argued), Townsend, Ross Cannon (argued), Helena, for defendants and appellants.

Lloyd J. Skedd (argued), Helena, for claimant and respondent.

MR. CHIEF JUSTICE JAMES T. HARRISON, delivered the Opinion of the Court.

This is an appeal from the district court of Broadwater County in a case arising under the Workmen's Compensation Act. It raises the sole question of whether a valid marriage existed between Mona Miller and the deceased Charles D. Carter at the time of his death in an industrial accident on February 26, 1964.

The Industrial Accident Board held that there was no marriage and Mona's claim was denied. Deceased's mother survived him and her claim for the benefits provided by the

212

Workmen's Compensation Act was approved. An appeal was taken by Mona to the district court and that court entered findings of fact, conclusions of law and judgment reversing the action of the Industrial Accident Board and determining that Mona was the common-law wife of the decedent. This appeal followed.

We will set forth a brief recitation of the fact situation prevailing. Charles D. Carter, hereafter referred to as Charles, and Mona Miller, being Mona Miller McWilliams and referred to in this case as Mona Miller Carter, hereafter referred to as Mona, met in January of 1963 in California at which time both were married to other persons. Within two or three weeks following this meeting they commenced living together. Charles' wife, Mary Carter, was killed in an automobile accident on June 24, 1963. About the 5th day of July, 1963 Charles and Mona arrived in Townsend, Montana, and stayed at a truck stop known as the Beacon, owned and operated by Charles' sister. While they stayed there Mona worked for Charles' sister and her pay checks were made out to her as Mona Miller.

Along about September 4th or 5th, 1963, they went to Billings where for a time they resided at the Blue Motel. Mona's husband divorced her on October 18, 1963, but she did not know of a possible divorce until she received a letter from her mother around November 4, 1963, in which her mother wrote that she had heard a divorce had been granted. Mona did not receive a copy of the decree, nor did she know the date or place of granting the divorce, until after Charles' death. About January 17, 1964, Charles came back to Townsend, Mona remained in Billings and moved to the Harris Apartments, where she registered as Mona Miller and her apartment utilities were under the name of Mona Miller. On January 27, 1964, Charles assigned a car title to Mona showing her name as Mona G. Miller. Mona went to work in the Turf Cafe in Billings and her pay checks were made out to

Mona Miller. She registered for general delivery at the Billings post office as Mona Miller, received mail from Charles under that name, as well as from other persons.

On February 14, 1964, Charles went to Billings and Mona came back to Townsend with him and on the 15th of February took up residence at the Beacon Motel. Eleven days later Charles was killed.

Charles wrote his mother a letter from Billings, dated January 18, 1964, and we quote portions thereof:

"Well, I don't know for sure when I will be leaving here. But I was planning on going around the 5th of Feb. But Mona and I are having troubles now too. So I may just up and go next week. But I doubt it for I won't have enough money to get me there. So I suppose I will have to wait until around the 5th of Feb.

"Her and I were figuering on getting married this spring. But I don't think we will, for we just can't seem to get along for very long at a time. She is pretty hot headed, and so am I and one thing just leads to another, until we are at it.

"I met her last March, when Mary and I were having our trouble. And we got along real swell, until Mary got killed and we came up here, and its been a fight seems like ever since."

The letter then referred to the death of his wife, Mary, and continued: "And from then on it seems like Mona and I have done nothing but argue. So as I say I may be leaving here by myself before or around the 5th of Feb."

There is considerable testimony in the record as to quarrels and arguments between Charles and Mona.

At the hearings in this cause, besides herself, Mona presented two witnesses in her behalf. Iona Pauley, operator of the Blue Motel, testified on direct examination as to Charles and Mona living together in the motel and she thought they were husband and wife, that Mona had told her they were married in April of 1963. On cross-examination she testi-

fied that sometime after Christmas Charles said to her: "I guess you know Mona and I aren't married." She further testified that following the death of Charles she received a letter from Mona in which she said that Charles had been killed and that she was his common-law wife.

Art Olson, a resident of Helena for the past seven years and before that a resident of Townsend, testified as to his acquaintance with Charles over many years but he had not seen him for six or seven years when he met him on Main Street in Townsend on February 8, 1964, at which time they had a conversation and Olson asked about his wife Mary and Charles replied: "Mary is dead, I have a new wife, Mona." They did not see each other again.

On cross-examination it developed that after Charles' death Olson had gone to see Charles' sister and brother-in-law to find out what was going on, what was the deal. He said he had met Mona and he was trying to find out what this insurance was, who was supposed to get the money. He further admitted that he was a married man but not living with his wife and while he denied going with Mona he admitted they had been out together for dinner six or eight times in the preceding two months.

Offsetting this testimony was that of fellow workers and residents of Townsend whose testimony reflected that Charles never held Mona out as his wife, nor did Mona hold Charles out as her husband previous to his death. Of course there are exhibits of various kinds indicating that on occasion Mona used the name Carter instead of Miller but most of these are after the death of Charles.

On this record the district court reversed the holding of the Industrial Accident Board and held that Mona was the common-law wife of Charles within the meaning of section 48-101, R.C.M.1947.

The district judge filed an opinion in this cause outlining his reasons for arriving at his judgment and we quote:

"Claimant and deceased commenced to live together in January, February or July, 1963. From that time until January 18, 1964, the evidence introduced showed conditions existed very similar to those set forth in Morrison, et al., v. Sunshine Mining Company, 64 Idaho 6, 127 P.2d 766, and Albina Engine and Machine Works, etc., v. J. J. O'Leary, et al., 9 Cir., 328 F.2d 877. Both cases held a common law marriage existed.

"We can accept the relationship between claimant and Charles Carter as illicit in 1963. It is agreed by all that claimant and Charles Carter did live together and carried on certain relations as if they were husband and wife.

"Sometime immediately prior to January 18, 1964, claimant, over a dispute, left deceased and went to live alone in Billings. Decedent on January 18, 1964, wrote his mother that he intended to marry Nona (sic) if all could be straightened out. Six weeks before his death Charles Carter went to Billings and returned to Townsend with Nona (sic). They did not return to live in the sister's bar, but rented an apartment and claimant and Charles Carter lived in the relationship he described in his letter to his mother, that of husband and wife, Section 48-101, R.C.M.1947, being fully satisfied."

The two cases cited by the court are both interpretations of the Idaho statutes. There is no reason to discuss either case herein for the reason that our laws are not the same and this court in Miller v. Sutherland, 131 Mont. 175, 309 P.2d 322, reviewed the Montana statutes and cases and this cause is to be determined under the rulings laid down therein. In that case we stated:

"Our statute with regard to marriage is R.C.M.1947, § 48-101, which provides:

" 'Marriage is a personal relation arising out of a civil contract, to which the consent of parties capable of making it is necessary. Consent alone will not constitute marriage; it must be followed by a solemnization, or by mutual and public assumption of the marital relation.'

"R.C.M.1947, § 48-103, provides: 'Consent to and subsequent consummation of marriage may be manifested in any form, and may be proved under the same general rules of evidence as facts in other cases.'

"In construing our statutes this court in Welch v. All Persons, 85 Mont. 114, 133, 278 P. 110, 115, stated:

" 'Marriage is defined by our statute as a "personal relation arising out of a civil contract, to which the consent of parties capable of making it is necessary". Section 5695, R.C.M.1921 [§ 48-101, supra]. This terse definition embraces the essential elements recognized by the authorities generally. See 38 C.J. 1272 et seq.; 18 R.C.L.381 et seq.

" 'The consent of the parties must be mutual. Shepherd & Pierson Co. v. Baker, 81 Mont. 185, 262 P. 887. While the consent need not be expressed in any particular form (section 5697, R.C.M.1921 [§ 48-103, supra]), as we said in State v. Newman, 66 Mont. 180, 213 P. 805, it must always be given with such an intent on the part of each of the parties that marriage cannot be said to steal upon them unawares. "One cannot become married unwittingly or accidentally. The consent required by our statutes, as well as the statutes of every state, and by the common law, must be seriously given with the deliberate intention that marriage result presently therefrom."

"There must be an agreement between the parties that they will hold toward each other the relation of husband and wife, with all the responsibilities and duties which the law attaches to such relation, otherwise there can be no lawful marriage." Williams v. Williams, supra [46 Wis. 464, 1 N.W. 98, 32 Am.Rep. 722]. The absence of such consent renders the relations of the parties meretricious. 38 C.J. 1316.' * * *

"We stated in State v. Newman, 66 Mont. 180, 188, 213 P. 805, 807:

" 'The necessary consent need not be expressed in any particular form. Section 5697 Rev.Codes 1921. In a proper case it may even be implied from the conduct of the parties. Uni-

versity of Michigan v. McGuckin, 64 Neb. 300, 89 N.W. 778, 57 L.R.A. 917. But the consent, whether in express words, or implied from conduct, must always be given with such an intent on the part of each of the parties that marriage cannot be said to steal upon them unawares. * * * The words manifesting the consent may be spoken in the face of the church, or immediately preceding an act of sexual intercourse, as claimed in this case. But they must always be spoken by those who know and intend that matrimony in full form shall be the result. Marriage cannot be created piecemeal. It comes instantly into being, or it does not come at all. If anything remains to be done before the relationship is completed in contemplation of the parties themselves, there is no marriage.

" ' "In order to constitute a marriage *per verba* [*de*] *praesenti* the parties must agree to become husband and wife presently. The consent which is the foundation and essence of the contract must be mutual and given at the same time, and it must not be attended by an agreement that some intervening thing shall be done before the marriage takes effect, or that it be publicly solemnized. That is to say, it must contemplate a present assumption of the marriage status, in distinction from a mere future union." Lord Brougham in Queen v. Millis, 10 Cl. & F. 534, 708, 730; Clark v. Field 13 Vt. 460. Beneficial Ass'n v. Carpenter, 17 R.I. 720, 24 A. 578.'

\*   \*   \*   \*   \*   \*

"As was stated in Welch v. All Persons, 78 Mont. 370, 386, 254 P. 179, 183:

" 'Every lawful marriage must have been entered into by the parties at some particular time. It does not result from mere cohabitation alone. "As a general rule, when a marriage is sought to be proved by conduct, cohabitation and repute, the date of the marriage in fact, which such conduct and repute tends to establish, is the date of the commencement

of such conduct and repute, and not afterwards." Williams v. Williams, 46 Wis. 464, 1 N.W. 98, 32 Am.Rep. 722.'

\*　　\*　　\*　　\*　　\*　　\*

"As was stated in Elliott v. Industrial Accident Board, 101 Mont. 246, 254, 53 P.2d 451, 454:

" 'One of the disputable presumptions in this state is "that a man and a woman deporting themselves as husband and wife have entered into a lawful contract of marriage." Subdivision 30, sec. 10606, Rev. Codes 1921 [R.C.M.1947, § 93-1301-7].

" 'The so-called "common-law marriage" is recognized as valid in this state, but, to be effective there must be the mutual consent of parties able to consent and competent to enter into a ceremonial marriage, and the assumption of such relationship, by consent and agreement, as of a time certain, followed by cohabitation and repute.' ·

"Thus the parties must enter upon a course of conduct to establish their repute as man and wife. This course of conduct cannot be partial, it must be complete and sincere. \*　\*　\*

"When we speak of repute we mean reputation, being the character and status commonly ascribed to one's actions by the public. \*　\*　\* The burden of establishing the marriage was on appellant \*　\*　\*."

Returning to the court's opinion the judge accepted the relationship as illicit in 1963 and went on to state that six weeks before his death Charles brought Mona to Townsend, although the record shows it was only 12 days; further, that they did not return to live in the sister's bar, although the record shows that the sister's business was a cafe and motel; further, that they rented an apartment, although the record shows that they stayed there but a single night and then went to the sister's motel. There the record shows they occupied a room with a hot plate for cooking but it was little used since their meals were either taken at the cafe or carried from the cafe to their room. The court finally observed that Charles and Mona lived in the relationship he, Charles, described in

his letter to his mother, that of husband and wife. We have heretofore quoted the only portions of this letter which directly deal with Mona and that states exactly the opposite.

█ █ It was incumbent upon Mona to prove by a preponderance of the evidence that a mutual and public assumption of the marital relation existed. Instances of cohabitation on the part of the parties, and admittedly the record is replete with such instances here, can support the conclusion of meretricious relations as easily as any other. The parties must enter upon a course of conduct to establish their repute as man and wife. By repute we mean reputation, being the character and status commonly ascribed to one's actions by the public. The evidence herein falls far short of establishing a reputation by Charles and Mona that they were husband and wife.

█ We have many times held that the district court is not justified in reversing findings of the Industrial Accident Board if there is sufficient evidence to sustain them. See Stordahl v. Rush Implement Co., 148 Mont. 13, 417 P.2d 95, and cases therein cited.

█ Our determination is that the facts disclosed by the record here do not preponderate against the findings of the Industrial Accident Board and the district court erred when it held that the order of the Industrial Accident Board was not sustained by the evidence, was unreasonable and ordered the same to be set aside.

Accordingly the judgment is reversed and the order of the Industrial Accident Board herein is ordered reinstated.

MR. JUSTICES HASWELL, ADAIR and CASTLES, concur.