FILED

May 27 2009

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

DA 08-0472

IN THE SUPREME COURT OF THE STATE OF MONTANA

2009 MT 186

IN RE THE MARRIAGE OF
JACQUELINE J. SWANNER-RENNER,

Petitioner, Appellee and Cross-Appellant,

and

JAMES GERALD RENNER,

Respondent and Appellant.

APPEAL FROM: District Court of the Sixteenth Judicial District,
In and For the County of Custer, Cause No. DR 06-055
Honorable Joe L. Hegel, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Kevin T. Sweeney, Attorney at Law; Billings, Montana

For Appellee:

J. Dennis Corbin, Attorney at Law; Miles City, Montana

Submitted on Briefs: April 29, 2009

Decided: May 27, 2009

Filed:

_____
Clerk

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1     This is an appeal and cross-appeals from the District Court's Findings of Fact, Conclusions of Law and Order dated March 3, 2007; the Findings of Fact, Conclusions of Law and Decree of Dissolution of Marriage dated July 10, 2008; and the Memorandum and Order Amending Findings of Fact, Conclusions of Law and Decree of Dissolution of Marriage dated September 17, 2008.

¶2     James presents the following issues for review:

¶3     Issue One:  Whether the District Court properly held that the parties entered a valid common law marriage.

¶4     Issue Two:  Whether the District Court erred by not granting James' post-trial request to conduct additional discovery and present additional testimony.

¶5     Jacqueline presents issues which we restate as follows:

¶6     Issue Three:  Whether the District Court properly distributed the marital assets.

## PROCEDURAL AND FACTUAL BACKGROUND

¶7     In April, 2006, Jacqueline filed a petition for dissolution of marriage and for an equitable distribution of the parties' property and obligations.  She alleged that she and James met and were then married by common law on October 4, 1994 when they both were single and resided in the State of Washington.  James and Jacqueline each owned property in Washington and were employed there.  October 4, 1994 was the date of an informal ceremony conducted by James and Jacqueline in which they vowed their intention to be married "under God."  The next day she executed a will referring to James as her "dear

2

friend," devising him one-half of her estate, and making him trustee of the other half for the benefit of her children.

¶8      In 1995 the parties moved to Montana and James bought a ranch near Ismay, where they planned to live and raise horses. The majority of the $340,000 purchase price came from the proceeds from the sale of pre-marital property in Washington owned by James. While the ranch was not economically viable, James and Jacqueline resided there together until 2006. At the time of the property distribution, the District Court found that the value of the ranch had increased to $660,000. Between 1994 and 2006 the parties concluded a number of other property and asset sales and transfers, each selling pre-marital property and contributing the proceeds to family and ranch expenses.

¶9      After moving to Montana, James executed several documents, including a "declaration of marriage" all of which indicated that he was married to Jacqueline. He also filed tax returns as a person married, filing separately. James was introduced to others as Jacqueline's husband.

¶10     The District Court held a hearing on September 20, 2006 on the issue of whether the parties had been married at common law. The District Court found that James and Jacqueline were married as of the date of the vows in Washington on October 4, 1994, and that the marriage had ripened into a common law marriage under Montana law after the parties moved to this state. James disclaims any intent to have married Jacqueline.

¶11     The District Court dissolved the marriage and distributed the marital assets in a subsequent proceeding in 2008. An initial decree filed July 10, 2008, valued and divided a long list of personal property in accordance with a listing, referred to as Exhibit A, prepared

3

by Jacqueline. The court found that the ranch had been purchased with pre-marital assets and awarded it to James. James was ordered to pay Jacqueline $320,000 representing the value of a parcel of pre-marital property she deeded to James; and awarded each party specific pre-marital assets. On September 17, 2008, the District Court adopted an amendatory order reducing the cash award to Jacqueline to $134,775.

¶12 Both parties appeal.

**STANDARD OF REVIEW**

¶13 A district court's findings of fact will not be set aside unless they are clearly erroneous, giving due regard to the opportunity of the court to judge the credibility of witnesses. *In re Est. of Sartain*, 212 Mont. 206, 209, 686 P.2d 909, 911 (1984). Findings are clearly erroneous if they are not supported by substantial evidence, if the district court misapprehended the effect of the evidence, or if our review of the record convinces us that the district court made a mistake. *In re Marriage of Steinbeisser*, 2002 MT 309, ¶ 17, 313 Mont. 74, 60 P.3d 441. If the findings are not clearly erroneous, then the court's distribution of property is discretionary and is reviewed for abuse of discretion. *In re Marriage of Stufft*, 286 Mont. 239, 243-44, 950 P.2d 1373, 1376 (1997). When the evidence varies widely, the district court is required to give its reasons for selecting one valuation over others. *In re Marriage of Hurley*, 222 Mont. 287, 296, 721 P.2d 1279, 1285 (1986).

**DISCUSSION**

¶14 *Issue One: Were the parties married by common law?* James concedes that the facts regarding the common law marriage issue were "largely undisputed." He contends however

4

that his relationship with Jacqueline was "illicit throughout" and that they were never married.

¶15 The District Court found that the parties had exchanged vows of marriage in Washington in 1994. James testified that he did not recall the ceremony, but the District Court found that his testimony was not credible. The District Court found that while Washington does not recognize common law marriage, the consent to marry declared there ripened into a common law marriage under Montana law after the parties moved here in 1995. James filed several Federal tax returns indicating that his status was married, filing separately. In sworn deposition testimony in another case in Montana in 1999, James identified Jacqueline as his wife. Most persuasive as to James' intent were several documents that he executed for purposes of obtaining benefits from his union. A 2001 document signed by James and Jacqueline, and submitted to his union declared:

> We both affirm our status as married to each other. We live together as husband and wife, have joint bank accounts, bills, share a household and own property jointly. Paperwork that documents his cohabitation is enclosed.

Another document submitted to the union for health care coverage identifies Jacqueline as his "wife." The District Court concluded that these documents "are what cements the finding of the marital relationship."

¶16 In Montana there is a rebuttable presumption that a man and woman "deporting themselves as husband and wife have entered into a lawful contract of marriage." Section 26-1-602(30), MCA. The presumption of matrimony is "one of the strongest known to the law," and the law favors a finding of matrimony. *In re Est. of Murnion*, 212 Mont. 107, 113 686 P.2d 893, 897 (1984).

5

¶17     The party seeking to establish a common law marriage in Montana must show that the parties were competent to enter marriage; that there was assumption of a marital relationship by mutual consent and agreement; that they cohabited; and that they acquired the reputation, character and status of marriage in public. *Miller v. Townsend Lumber Co.*, 152 Mont. 210, 218, 448 P.2d. 148, 152 (1968); *In re Marriage of Geertz*, 232 Mont. 141, 145, 755 P.2d 34, 37 (1988). The parties must "enter upon a course of conduct to establish their repute as husband and wife." *In re Est. of McClelland*, 168 Mont. 160, 165, 541 P.2d 780, 783 (1975).

¶18     Clearly the facts in this case are sufficient to meet the requirements for common law marriage in Montana. Other than a general denial that he and Jacqueline were married, James did not offer materially conflicting evidence and in fact concedes on appeal that the facts are not disputed. Evidence admitted at trial demonstrated that James consented to marriage and held himself out as married to Jacqueline. The evidence also demonstrated that James and Jacqueline had the public reputation as being married to each other.

¶19     James' primary argument rests on the fact that the 1994 vows that evidence the consent to marriage were spoken in Washington, and Washington does not recognize common law marriage. He argues that the District Court erred in ruling that the Washington consent ripened into common law marriage after the parties moved to Montana. He relies on statements in some Montana cases that common law marriage does not come about piecemeal, but must come into existence instantly. *See e.g. Miller*, 152 Mont. at 218, 448 P.2d. at 152; *Est. of McClelland*, 168 Mont. at 165, 541 P.2d at 783.

¶20     This issue is controlled by this Court's decision in *Estate of Murnion*. That case is similar to the present one in that the parties also originally manifested their consent to

6

common law marriage while living in Washington, and then moved to Montana. Washington's law against common law marriage was an impediment to marriage as long as the parties lived there, but we concluded that once the impediment of Washington law was removed by the parties' relocation to Montana, the relationship ripened into a valid marriage under Montana law. This Court relied upon the strong policy to apply Montana law to these situations, and to "recognize the validity of marriage." *Est. of Murnion*, 212 Mont. at 117-18, 686 P.2d at 899. *See also* § 40-1-401(2), MCA, providing that when the parties to a prohibited marriage continue to cohabit after removal of the impediment, there is a lawful marriage.

¶21 *Estate of Murnion* also discussed the language in some cases that James cites in this appeal that a common law marriage must take place immediately or instantly, or not at all. This Court held in *Estate of Murnion* that the immediacy requirement was not determinative because a valid common law marriage requires cohabitation and establishment of public repute. Neither of these necessary elements of common law marriage can take place instantly "but are continuing factors that extend through the life of the marriage." *Est. of Murnion*, 212 Mont. at 118, 686 P.2d at 899. We agree with the reasoning in *Estate of Murnion*. The requirement of instant common law marriage is inconsistent with the establishment of the necessary requirements of the relationship, including cohabitation and establishment of public repute. These required factors cannot be established immediately, and therefore a requirement that all elements of common law marriage come into being immediately is inconsistent, confusing and unnecessary. We therefore overrule the statements in *Miller*, *Estate of McClelland*, and in other prior cases that common law

7

marriage must come instantly into being or not at all. The party seeking to establish common law marriage must prove its elements as noted above, but is not held to the impossible burden of proving that they all happened immediately or instantly.

¶22 The District Court concluded that the parties entered into a common law marriage as of the date of their vow of consent to do so on October 4, 1994. This is consistent with the result in *Est. of Murnion*, 212 Mont. at 118, 686 P.2d at 899. We affirm the District Court's decision that James and Jacqueline were married by common law as of October 4, 1994.

¶23 Issue Two: Whether the District Court erred by not granting James' post-trial request to conduct additional discovery and present additional testimony. After the evidentiary hearing on property issues, James moved the District Court to allow him to reopen discovery and to present additional testimony. The District Court denied the motion, finding from the record that James' request was based upon records he already had in his possession but had not disclosed to Jacqueline or the court, and that they did not indicate current ownership or previously undisclosed assets.

¶24 On appeal James argues that the District Court erred denying his motion because Jacqueline's testimony at trial was "incredible" and was "remarkably discounted by the District Court." James does not factually dispute the District Court's conclusion that the documents he relied upon for this motion were in his possession at the time of trial. James has not presented any reason to disturb the District Court's exercise of its discretion on this matter and we decline to do so.

¶25 Issue Three: Whether the District Court properly distributed the marital assets.

8

¶26 Jacqueline raises several issues concerning the District Court's distribution of marital assets. First, she contends that the District Court failed to allocate or distribute any personal property to her. In the District Court proceedings Jacqueline presented a document referred to as "Exhibit A" listing in great detail the parties' personal property, the value of each item, and a proposed distribution of each item. With the exception of specifically noted items of premarital real property, the District Court's Findings of Fact adopted Exhibit A and agreed with the values and distribution stated therein. The District Court concluded that the marital estate should be "valued and distributed as set forth in the findings of fact and in particular ¶¶16-18." Paragraph 17 of the Findings addresses all the items of personal property in Exhibit A. In the Final Decree, the District Court ordered that "[t]he marital estate is distributed as set forth above."

¶27 We construe this plain language of the District Court as valuing and ordering the distribution of the many items of personal property in accordance with Exhibit A. No other allocation or distribution of the personal property was required. Jacqueline and James are each entitled to the items of personal property as distributed in Exhibit A, as adopted by the District Court's order of July 10, 2008.

¶28 Second, Jacqueline argues that the District Court erred in amending the July findings, conclusions and order. Jacqueline moved to alter or amend the original property division on the ground that the District Court should clarify the mechanism by which James was to pay her the interest in personal property that she was entitled to under Exhibit A, noted above.

¶29 James challenged the July order that he pay Jacqueline $320,000 in cash. The court had determined that $320,000 was the amount realized from a property sale, Jacqueline's

9

"premarital Thronson property," and that those proceeds had been used to acquire "other marital assets." James contended that requiring him to pay $320,000 in cash along with dividing the remaining personal property equally had forced him to pay an unequal share to Jacqueline.

¶30 In the September order, the District Court found "merit" in Jacqueline's request for clarification and provided specific parameters for James to pay Jacqueline the amount he owed. In addition, the District Court found merit in James' "double-dipping" argument.

¶31 The District Court then conducted, based on the July findings, a re-calculation of the amounts that each party had contributed to the acquisition of the personal property. The court found that Jacqueline contributed $13,000 more than James. Adding that to the $121,775 previously determined to be half of the value of the personal property still in the possession of James, the court awarded $134,775 to Jacqueline and vacated the $320,000 awarded in the July order.

¶32 We conclude that the amount awarded to Jacqueline for her share of the personal property was supported by substantial evidence and that the District Court's findings were not clearly erroneous.

¶33 Third, Jacqueline contends that the District Court erred in awarding to James the entire $660,000 value of the ranch without accounting for her monetary and non-monetary contributions to the increase in value since it was purchased for $340,000. The evidence is undisputed that at least the great majority of the purchase price of the ranch came from the sale of James' pre-marital property. The District Court therefore deemed the ranch and all its

10

increase in value to be James' pre-marital property and did not award any interest in it to Jacqueline.

¶34 Section 40-4-202, MCA, governs the division of pre-marital property in a dissolution of marriage. That section requires the court to equitably apportion property or assets belonging to "either or both, however and whenever acquired . . . ." In assessing the increased value of pre-marital property during the time of the marriage, the court is also required to consider the contributions of the other spouse to the marriage and to the preservation or appreciation of the property. *Marriage of Steinbeisser*, ¶ 47.

> The non-acquiring spouse is entitled to an equitable share of only the appreciated or preserved value which is attributable to his or her efforts. A court cannot distribute to the non-acquiring spouse property acquired prior to the marriage when there is no evidence that the spouse made any contribution to those assets in any form. Absent a showing of contribution, being the family homemaker does not alone entitle one to the appreciation in property. Finally, a non-acquiring spouse is not entitled to a share of the increase in premarital property when the property's appreciation is due simply to market factors.

*Marriage of Steinbeisser*, ¶ 47 (citations omitted).

¶35 In this case Jacqueline presented evidence tending to show that she was entitled to receive some of the appreciated value of the ranch, where the parties lived and worked together for ten years. That included evidence that she cared for the ranch while James was away for months working out of state in order to vest his union retirement. She presented evidence of the work she did around the ranch when James was present. She sold her own pre-marital property and contends that they both used those proceeds and others to acquire animals, equipment and supplies necessary to keep the ranch going. James, on the other

11

hand, contends that the entire increase in value of the ranch was due to market factors and that Jacqueline is not entitled to any of the increase in value.

¶36 We cannot review this issue beyond the parties' contentions because the District Court made no findings as to whether Jacqueline was entitled to share in the increase in the value of the ranch, as required by § 40-4-202, MCA. *Marriage of Steinbeisser*, ¶¶ 37, 47; *In re Marriage of Rolf*, 2003 MT 194, ¶ 22, 316 Mont. 517, 75 P.3d 770. The District Court, in ¶ 17 of the July order, may have intended to make an equitable determination that the increase in value of the Montana ranch and the $320,000 contributed to the marital estate by the sale of Jacqueline's Thronson property were roughly equal, justifying awarding James the ranch and Jacqueline the payment for her property. However, the September order severely reduced the cash award to Jacqueline by deeming the proceeds of the Thronson property to be general marital assets without providing a concomitant correction based on the value of Jacqueline's contribution to the appreciated value of the ranch. Whatever the court's intent, there was no evaluation of Jacqueline's potential interest as required by § 40-4-202, MCA.

¶37 We therefore reverse on this issue and remand to the District Court for further determination of Jacqueline's contribution to the increased value of the ranch.

¶38 The District Court is affirmed in part, reversed in part and the case is remanded for further proceedings.

/S/ MIKE McGRATH

We concur:

12

/S/ JAMES C. NELSON
/S/ W. WILLIAM LEAPHART
/S/ PATRICIA COTTER
/S/ BRIAN MORRIS