JUSTICE MORRIS
delivered the Opinion of the Court.
¶1 Far too often this Court faces a situation in which minor children *515 have no adult fit to parent them. See e.g. In re E.D., 2008 MT 216, 344 Mont. 228, 186 P.3d 1283; In re M.P., 2008 MT 39, 341 Mont. 333, 177 P.3d 495; In re Custody and Parental Rights of A.P., 2007 MT 297, 340 Mont. 39, 172 P.3d 105. This case presents the increasingly unusual situation of two adults fit to parent minor children, L.M. and A.M. The District Court awarded a parental interest in the minor children to Appellee Michelle Kulstad (Kulstad) over the objection of the Appellant Barbara L. Maniaci (Maniaci). The court also awarded Kulstad an interest in personal and real property. We affirm.
¶2 Maniaci presents the following issues on appeal:
¶3 Whether the court’s application of §40-4-211 and 40-4-228, MCA, to support Kulstad’s claim of a parental interest violates Maniaci’s fundamental constitutional rights as a parent.
¶4 Whether the court properly awarded Kulstad a parental interest.
¶5 Whether the court properly awarded Kulstad personal property and a property interest in the parties’ home.
PROCEDURAL AND FACTUAL BACKGROUND
Background
¶6 Maniaci moved to Clinton, Montana, in late 1994 or early 1995. Maniaci and Kulstad met in Montana in late 1995. Maniaci lived in a trailer on her sister’s property and worked part-time as a chiropractor out of her sister’s home. Kulstad lived in Seattle, Washington. She worked in Seattle on business ventures and supported herself with her accumulated assets. The parties’ relationship progressed to the point that they began staying with each other at their respective homes. Kulstad eventually moved to Montana in 1996 to live with Maniaci.
¶7 Kulstad and Maniaci exchanged rings on March 18,1996. Kulstad and Maniaci wore the rings until the fall of 2006. Maniaci also gave Kulstad three anniversary cards. Maniaci represented Kulstad as her “partner” on numerous occasions. The parties attended couples counseling in 2002, 2003, and 2006. The parties’ mutual friends regarded them as domestic and intimate partners, and later as co-parents.
¶8 Kulstad supported the parties primarily with her accumulated assets from 1996 to 2001. Kulstad and Maniaci had a joint automobile insurance policy naming each of them as insureds. Maniaci added Kulstad to the homeowner’s insurance policy. Maniaci executed a living will that authorized Kulstad to make her end-of-life decisions.
Parental Interest
¶9 Kulstad and Maniaci periodically discussed the possibility of co- *516 parenting a child. L.M. came unexpectedly to them in mid-February 2001 when Maniaci’s chiropractic patient, Camilla Eddy (Eddy), inquired whether Kulstad and Maniaci had an interest in adopting her great grandson, who lived in Anaconda. Eddy believed that L.M.’s mother provided inadequate care. A couple of days later, Eddy, fearing for L.M.’s life, contacted the parties. Kulstad and Maniaci drove to Anaconda where L.M.’s natural mother relinquished custody to the parties.
¶10 Kulstad and Maniaci took L.M. to the hospital and entered his name as ‘L.L. Kulstad-Maniaci.” Kulstad and Maniaci sought legal advice regarding same-sex adoptions. Their lawyer advised them that Montana law allowed only one of them to adopt L.M. The parties decided that Maniaci would be the adoptive parent. Kulstad and Maniaci agreed that L.M. would call only one of them “mom” and they further agreed not to hyphenate L.M.’s last name. Kulstad and Maniaci also agreed that they would function equally as parents even though only one of them could adopt L.M.
¶11 Kulstad and Maniaci participated in a home study with social worker Cynthia Garthwait (Garthwait) in July 2001 as part of the adoption process. Kulstad and Maniaci further participated in an adoptive post-placement report with Garthwait in April 2002. Maniaci represented to Garthwait at each meeting, and Garthwait understood, that Maniaci and Kulstad were in a committed relationship. Garthwait further understood that Kulstad would co-parent and support L.M.
¶12 Maniaci decided in 2003 that she wanted to adopt a baby girl. Kulstad initially disagreed with Maniaci about bringing another child into the home. Maniaci pursued the adoption over Kulstad’s objection. Kulstad and Maniaci understood nonetheless that Kulstad would function as a parent to any second child that Maniaci adopted.
¶13 Kulstad and Maniaci participated in a home study with Dennis Radtke (Radtke) to adopt a second child. Maniaci represented to Radtke that Kulstad would co-parent and support A.M. Maniaci sent an email inquiry to the Human Rights Campaign in March 2003, about adopting a second child. Maniaci stated that she and her “partner” had completed a private adoption and a home study ‘for our boy” and ‘how we would like to adopt a baby girl.” Maniaci eventually adopted A.M. from Guatemala.
¶14 Kulstad lived with the children and functioned as a parent to the children on a day-to-day basis for the remainder of her relationship with Maniaci. Kulstad and Maniaci provided for the children’s physical, psychological, and developmental needs much like any other *517 two-parent family. Maniaci assumed primary responsibility for purchasing groceries and supplies or services for the children. Maniaci primarily cared for the children during the day while Kulstad worked outside the home. Kulstad cared for the children in the afternoon and early evening when Maniaci saw chiropractic patients in the basement office of the house in which the parties lived. Kulstad primarily cared for the children on the weekends. The parties jointly participated in holding therapy with L.M. to address his reactive attachment issues.
¶15 Kulstad included Maniaci and the children in her will and as beneficiaries in her life insurance policies. Kulstad also claimed L.M. as a dependent on her tax returns for the years 2001 through 2006, and head of household status, with Maniaci’s full knowledge and consent. Kulstad and Maniaci agreed that Maniaci would claim A.M. on her tax returns in 2004. Maniaci had not filed tax returns for the years 1999 through 2006 at the time this action had begun. Months later, Maniaci filed back tax returns for those years in which she sought to claim L.M. as a dependent.
¶16 Maniaci had her tax returns prepared for 2001, 2002, and 2003, in anticipation of adopting A.M. These tax returns contained inflated income figures. Maniaci provided these inflated income figures to the Guatemalan government with A.M.’s adoption application. Maniaci never filed these tax returns with the Internal Revenue Service. Kulstad remained unaware of their existence until Maniaci produced them in response to Kulstad’s discovery request in this case.
Property
¶17 Maniaci had purchased a 4.5 acre tract of land for $30,000 in July 1995. She paid approximately $43,214.73 for property improvements in 1995. Maniaci informed Kulstad and others, in early 1996, that she had no funds left to finish building the house. The parties understood that Kulstad would move to Montana and contribute her money and labor to help Maniaci complete construction of what would be their home. Kulstad contributed a portion of these monies from the sale of her house in Seattle to help fund the house in Montana.
¶18 Kulstad deposited her accumulated assets into the parties’ joint checking account from 1996-2001. Kulstad began contributing money and labor to complete the construction of the house and improvements to the real property in the spring of 1996. Kulstad also constructed outbuildings and a play area for the children. Kulstad worked on the house and property nearly full-time during the spring and summer of 1996.
¶19 Kulstad expressed concern to Maniaci in the spring of 1996 that *518 her name was not on the title. Maniaei assured Kulstad that the property would be divided equally should their relationship end. Kulstad relied on this assurance, as well as Maniaei’s promise, that in the event of her death, Maniaei would bequeath the property to Kulstad. Maniaei executed a will in 1998 that left the real property to Kulstad.
¶20 Kulstad began working as her assets neared depletion. Kulstad’s income failed to meet the financial needs of the parties. She used her credit cards to subsidize her income. Kulstad accrued debt for the benefit of the parties. She expended significant labor and money in helping Maniaei grow her chiropractic business. Kulstad worked to finish the basement office, entrance, deck, stairs, and trim. Kulstad’s accrued debt included many items designed to facilitate Maniaei’s chiropractic practice, such as paying the cost to finish the basement, purchasing Nikkei magnets, purchasing malpractice insurance, and purchasing chiropractic videos.
¶21 Maniaei initially agreed to help pay off the credit card debt. Maniaei’s income from her chiropractic practice, however, did not increase as much as she had expected. Maniaei eventually received inheritance monies in the late summer of2001. She refused to use this inheritance to help pay down the credit card debt in Kulstad’s name. Maniaei instead deposited her inheritance monies into separate accounts that only she could access. Maniaei had filed for bankruptcy in 1992. Maniaei expected Kulstad to file for bankruptcy if she could not pay off the debt. Kulstad ultimately filed for bankruptcy in May 2002.
Prior Proceedings
¶22 Kulstad filed a petition to dissolve the parties’ marriage and to receive a parenting interest on January 19, 2007. Kulstad sought a decree to dissolve the parties’ common law marriage and to distribute equitably the parties’ assets. Kulstad further sought an order of support of the minor children, an order granting her a parental interest, and an order implementing a parenting plan based on the best interests of the children. Kulstad also filed for the appointment of a guardian ad litem (GAL). The court issued a summons to Maniaei and a temporary economic restraining order to the parties.
¶23 Maniaei filed a motion to dismiss Kulstad’s petition for dissolution of marriage and parenting. She further objected to the appointment of a GAL. Maniaei also filed for a temporary restraining order (TRO) to prevent Kulstad from entering the family home.
¶24 The court denied Maniaei’s motion to dismiss Kulstad’s petition *519 for parental interest and parenting plan. The court appointed a GAL and issued a TRO. The court initially reserved judgment on the legal recognition of the parties’ relationship as a common law marriage. The court later rejected the dissolution portion of Kulstad’s petition on the basis that Montana law does not recognize same-sex marriages.
¶25 The court held a hearing on March 20,2007, to determine whether Kulstad had a parental interest in the minor children, whether Kulstad’s relationship with the children warranted an interim parenting plan, and whether the TRO should remain in effect. Jane Cowley, GAL, attended on behalf of the children. The court heard testimony from the parties and numerous witnesses.
¶26 Kulstad presented several witnesses who testified regarding her relationship with the children, including L.M.’s teachers and a close family friend. The GAL submitted a seventeen page report that recommended that the court protect and encourage Kulstad’s close relationship with the minor children. Doty Moquin (Moquin), a therapist who provided counseling to Maniaci and L.M., testified. Moquin relied upon her therapy sessions with Maniaci in arguing that Kulstad did not have a child-parent relationship with the minor children.
¶27 The court found Moquin’s testimony not credible. The court pointed to the contradictory testimony of other witnesses and the fact that Moquin had spoken to a limited number of people about Kulstad’s relationship with the minor children. The court deemed Moquin’s analysis insufficient to evaluate whether a child-parent relationship existed between Kulstad and the children. The court further cited the conflict created by Moquin’s testimony in view of the fact that she served as a therapist for Maniaci and for L.M.
¶28 The court recognized that Maniaci legally had adopted the minor children. The court concluded, however, that Kulstad had established by clear and convincing evidence that a child-parent relationship existed between her and both of the minor children in accordance with § 40-4-2 ll(4)(b) and (6), MCA. The court determined that an interim parenting plan served the children’s best interests. The court further determined that §40-4-228, MCA, applied to the final adjudication of parenting between the parties. The court allowed the TRO to remain in effect with the exception that Kulstad could return to the former family home for visitation exchanges.
¶29 The court revised the parenting plan on December 14, 2007. The court ordered the parties to participate in the Positive Alternative for Children Team (PACT) program. The court appointed Cindy Miller, *520 Ph.D. (Dr. Miller), to complete a parenting plan evaluation. The court authorized Dr. Miller to arrange a substitute GAL upon the completion of the parenting plan evaluation following Maniaci’s objection to Jane Cowley’s continued service as GAL. The court vested the GAL with authority to enforce the parenting plan. The court further allowed the GAL to recommend changes to the parenting plan, without a court order, based upon feedback from the parties’ participation in the PACT program. The court also authorized Dr. Miller to select a therapist for both children. Dr. Miller selected Paul Silverman, Ph.D. (Dr. Silverman), to provide therapeutic services for the children and the parties.
Parenting
¶30 The court held a bench trial on May 22 and 23,2008, to determine whether Kulstad should be awarded a permanent parental interest and whether the parties’ property should be divided equitably. The parties again presented testimony, witnesses, and evidence. The court-appointed expert, Dr. Miller, presented testimony regarding her educational background and her parenting plan evaluation. Kulstad presented testimony by Dr. Silverman and Suzanne Dixon, M.D. (Dr. Dixon). Trayce Hansen, Ph.D. (Dr. Hansen), testified for Maniaci. The District Court entered a series of findings of fact based on the evidence presented at the trial. We highlight those findings here in narrative form.
¶31 Dr. Miller had practiced in the clinical psychology field for twenty-one years, including three years at Shodair Children’s Hospital in Helena, Montana. Dr. Miller had been a member of the Missoula County Child Protection Team for ten years, and the Missoula County Child Abuse Referral and Evaluation Service Committee for six years. She had published her work in at least two major psychology and behavior journals.
¶32 Dr. Miller deemed both parties capable of being fit parents. Dr. Miller observed that the children had a strong attachment to both parties, consistent with the observation of the children’s teachers and mental health professionals. Dr. Miller noted Maniaci’s objection to the children’s relationship with Kulstad. She contrasted Maniaci’s objection with Kulstad’s support of the children’s relationship with Maniaci.
¶33 Dr. Miller also analyzed the children’s developmental needs. She opined that both children had significant attachment issues. The children also had difficulty regulating themselves emotionally. Dr. Miller described this attribute as a skill learned in secure *521 relationships. Dr. Miller noted that Kulstad had served as a psychological parent to the children before the parties’ separation and that Kulstad continued to serve in that role after the separation. She offered that Kulstad’s removal from their lives adversely would affect their future capacity to have stable, healthy relationships.
¶34 Dr. Miller also reviewed literature from the American Psychological Association (APA) regarding any effects on children of being raised in same-sex households. She asserted that a very strong consensus existed in the literature that showed no difference in children raised in same-sex households.
¶35 Dr. Silverman frequently conducts psychotherapy with the minor children individually, with the children and their parents, and with each adult separately. He started therapy with L.M. in April 2007 and with A.M. in September or October 2007. Dr. Silverman observed that both parties had parental relationships with the children. He concluded that Kulstad had a relationship with the children before therapy. He could not specify precisely, however, when that relationship had begun.
¶36 Dr. Silverman determined that Kulstad comfortably had served in a parenting role from the beginning of his contact with her and that “she expresses great love for the children, caring, generally-appropriate parental behavior.” Dr. Silverman believed it to be in the best interest of the children to maintain their relationship with Kulstad. Termination of the relationship would be detrimental to the children. He agreed with Dr. Miller’s parenting plan evaluation.
¶37 Dr. Dixon testified on the relevance of parental sexual orientation to children’s development. Dr. Dixon concluded that same-sex parents have no adverse impact on children’s adjustment or well-being. Children of same-sex parents fare just as well as their peers physically, psychologically, emotionally, cognitively, and socially. This development includes a child’s progression in gender and sexual development.
¶38 Dr. Hansen attacked the validity of Dr. Miller’s parenting evaluation. Dr. Hansen argued that Dr. Miller had failed to use reliable and valid assessment measures and techniques. Dr. Hansen asserted that Dr. Miller’s evaluation had failed to follow proper APA professional ethics guidelines. In particular, Dr. Hansen testified that the PACT program did not follow APA’s guidelines for child custody evaluations. Dr. Hansen pointed to the fact that PACT was a new program and no professionals had studied its efficacy. Dr. Hansen *522 argued that a published study of PACT would be needed before an objective evaluation could be made.
¶39 Dr. Miller, of course, had developed the PACT program. Dr. Miller conceded that she had modified the PACT program to fit the particular circumstances of this case. Dr. Hansen argued that this modification would require further study and evaluation once a proper review of the existing PACT program had been undertaken. Dr. Hansen testified that Dr. Miller’s use and reliance on this modified version of the PACT program was “unethicaFin light of psychologists’ need to “substantiate their findings” and demonstrate that their findings “are reliable and valid.”
¶40 Dr. Hansen argued that Dr. Miller initially should have followed the APA’s recommendation to use established professional and scientific standards. As a result, Dr. Hansen criticized Dr. Miller’s “own subjective clinical judgment opinion.” Dr. Hansen also criticized Dr. Miller’s assertion that the same-sex element in this case would have no effect on the children. She testified that Dr. Miller had failed to research the differences between children who are parented by same-sex couples and those who are parented by heterosexual couples.
¶41 Dr. Hansen admitted on cross-examination that parenting evaluations represented a new area for her and that she never actually had prepared one. Dr. Hansen never had been qualified as an expert witness by any court. Dr. Hansen never had been retained by any party as an expert witness. Dr. Hansen’s psychology practice involved geriatric patients. Dr. Hansen conceded that she currently did not work with children and had fewer than four years of professional experience after earning her Ph.D. She had worked as a research assistant and had published one article in the journal Personality Assessment in a forensic-type situation.
¶42 The court disagreed with Dr. Hansen’s criticisms of Dr. Miller’s parenting evaluation. Dr. Hansen’s qualifications did not support her criticism of Dr. Miller’s parenting evaluation or her testimony on the subject of the relevance of parental sexual orientation on children’s development. The court concluded that Dr. Miller had prepared her evaluation by following the generally-accepted practices in the field. The court accepted and adopted Dr. Miller’s parenting plan evaluation.
¶43 The court agreed with Dr. Miller and Dr. Silverman that both children had histories of significant abandonment and attachment issues. Kulstad represented a loving and stable force in the children’s lives and that it would be in the best interests of the children to continue their child-parent relationship with Kulstad. The court found *523 that Maniaci had presented no credible evidence to show that continuing the children’s relationship with Kulstad would not be in their best interest. The court noted that, contrary to Dr. Hansen’s testimony, the APA concludes that no evidence suggests that same-sex couples are unfit to be parents, or that psychosocial development among children of same-sex couples would be compromised in any respect.
¶44 The court determined that Maniaci and Kulstad had been domestic and financial partners with long-term commitments. Significant evidence established that the children regarded Kulstad as their parent. Maniaci claimed to have ‘lied” to the home study evaluators, Garthwait and Radtke, about her relationship with Kulstad. The court determined that the evidence established, however, that the parties’ relationship had been consistent with Maniaci’s original representations to Garthwait and Radtke.
¶45 The parties’ relationship placed the children into a family of same-sex parents. The court cautioned that the complexities of each child’s attachment disorders mandated the court to proceed with care and follow the advice of Dr. Miller and Dr. Silverman. The court awarded Kulstad a parental interest in L.M. and A.M. The court further determined that Kulstad would have equal decision-making authority with Maniaci regarding significant matters affecting the children.
¶46 The court issued an interim parenting schedule. The court ordered the parties and minor children to participate in the PACT program for one year. The court directed that a GAL, selected through the PACT program, submit recommendations for a final parenting schedule after one year. The court would review the GAL’s recommendations and issue a final parenting plan. The court authorized the GAL to recommend changes to the parenting schedule in consultation with Dr. Silverman, Dr. Miller, and Maniaci’s PACT appointed therapist.
Property
¶47 Maniaci first asserted that Kulstad’s contributions of money and labor to develop the real property represented nothing more than a gift. Maniaci next argued that Kulstad had intended for her contributions to the real property to serve as compensation for lodging. Maniaci finally claimed that Kulstad’s work on the property had been defective, in need of repair, and had damaged the value of the real property.
¶48 Kulstad had contributed significant money and labor to maintain the real property. She thinned trees, performed home and yard maintenance, paid property taxes, paid the homeowner’s insurance, *524 and paid for garbage service. Kulstad’s contributions of money and labor to improving and maintaining the real property from 1996 to 2006 had been significantly greater than Maniaci’s contributions. Kulstad had undertaken her work on the property for the joint benefit of the parties and minor children with Maniaci’s full knowledge and consent. The court thus determined that denying Kulstad any interest in the property unjustly would enrich Maniaci. The court awarded Kulstad $101,824.43 based upon Kulstad’s contributions toward the parties’ joint assets.
¶49 Kulstad had assumed primary responsibility for auto repairs and auto insurance for all vehicles regardless of how titled or used. Kulstad primarily drove the Kia Sportage. Maniaci primarily drove the Kia Sedona. The court awarded the Kia Sportage to Kulstad as an equitable award for her contributions of labor in improving the property. The court ordered the title to be transferred to Kulstad. The court allowed each party to retain all personal property then in her possession. Maniaci appeals.
STANDARD OF REVIEW
¶50 We review for correctness a district court’s interpretation and application of statutes. In re T.H., 2005 MT 237, ¶ 35, 328 Mont. 428, 121 P.3d 541. Questions of constitutionality involve a plenary review by this Court. In re Custody and Parental Rights of D.S., 2005 MT 275, ¶ 15, 329 Mont. 180, 122 P.3d 1239.
¶51 We review a district court’s findings of fact to determine whether the findings are clearly erroneous. Fischer v. Fischer, 2007 MT 101, ¶ 8, 337 Mont. 122, 157 P.3d 682. We will affirm the district court’s decision when substantial credible evidence supports the findings, unless there has been a clear abuse of discretion. Toavs v. Buls, 2006 MT 68, ¶ 7, 331 Mont. 437, 133 P.3d 202.
¶52 We view the evidence in the light most favorable to the prevailing party. In re Estate of Bradshaw, 2001 MT 92, ¶ 11, 305 Mont. 178, 24 P.3d 211. The trial court determines the credibility of witnesses and the weight assigned to their respective testimony. In re Bradshaw, ¶ 11. We do not consider whether evidence supports findings that are different from those made by the district court. We confine our review to the determination of whether substantial credible evidence supports the findings actually made by the district court. In re Bradshaw, ¶ 11.
*525 DISCUSSION
¶53 Whether the court’s application of §§40-4-211 and 40-4-228, MCA, to support Kulstad’s claim of a parental interest violates Maniaci’s fundamental constitutional rights as a parent.
¶54 Maniaci contends that she stands as the fit natural parent to the minor children after the adoption process had severed the parenting rights of the children’s biological parents. Maniaci argues that §40-4-228, MCA, improperly fails to require a court to determine the “fitness” of a natural parent before awarding a nonparent a parental interest based upon the best interests of the child. Maniaci further argues that her adopted children have no constitutionally protected rights, absent a showing of abuse, neglect, or dependency. She points to a series of decisions by this Court to support her claim that this Court continually has upheld the constitutionally protected rights of the natural parent over a third party.
Pre-1999 Decisions
¶55 In the first case, the Court in Matter of Guardianship of Doney, 174 Mont. 282, 570 P.2d 575 (1977), returned the children to the biological father even though the biological father had given their aunt temporary custody after the children’s mother had died. In In re A.R.A., 277 Mont. 66, 919 P.2d 388 (1996), the Court awarded custody to the absent biological father after the child’s mother died and the step-father had sought custody in favor of the biological father. Finally, the Court in Girard v. Williams, 1998 MT 231, 291 Mont. 49, 966 P.2d 1155, awarded custody to the biological father. The step-father had cared for the children after the mother had been murdered and after the biological father had been incarcerated. Girard, ¶¶ 3-5,9. The stepfather later died and his brother and wife assumed care of the children. Girard, ¶ 13. The court rejected the attempt by the brother and wife of the step-father to obtain legal custody to the exclusion of the biological father. Girard, ¶ 57. Maniaci argues that these cases establish that the Court has not recognized the ‘best interests of the child” standard absent a showing of abuse, neglect, or dependency.
¶56 A third party in each of these cases attempted to secure custody of the minor children to the exclusion of the biological parent. The parties, in essence, sought to terminate the parental rights of the biological parent based upon the best interests of the child. More importantly, these cases predate the 1999 amendments. The pre-1999 statutes made termination of parental rights, based upon dependency, abuse, or neglect, the only option available to the Court before it could award a nonparent a custodial interest. Doney, 174 Mont. at 286, 570 *526 P.2d at 577; In re A.R.A., 277 Mont. at 72, 919 P.2d at 392; Girard, ¶ 47.
1999 Amendments
¶57 The 1999 Montana legislature amended the nonparental statutes to recognize specifically a child’s constitutional rights in nonparental parenting proceedings. The legislature added §40-4-228, MCA, which provides that “when a nonparent seeks a parental interest in a child under 40-4-211 or visitation with a child, the provisions of this chapter apply unless a separate action is pending under Title 41, chapter 3.” Section 40-4-211(4)(b), MCA, allows a nonparent standing to seek a parenting interest of a minor child if the person has established a child-parent relationship.
¶58 Nothing in Section 40-4-228, MCA, limits its application to a finding of abuse or neglect. Section 40-4-228(2)(b), MCA, specifically provides that a party seeking a parental interest first must establish a child-parent relationship. The legislature also added §40-4-227(l)(a), MCA, which defers to the rights of the natural parent. Section 40-4-227(l)(a), MCA, provides that ‘it is the policy of the state of Montana to recognize the constitutionally protected rights of parents and the integrity of the family unit.”The statute seeks to balance the parent’s rights with the constitutionally protected rights of the child to determine the best interests of the child. Section 40-4-227(l)(a)-(c), MCA. The parent’s constitutionally protected interest in the parental control of a child should yield to the best interests of the child “when the parent’s conduct is contrary to the child-parent relationship.” Section 40-4-227(2)0»), MCA.
¶59 Statutes carry a presumption of constitutionality. In re Custody and Parental Rights of D.S., 2005 MT 275, ¶ 15, 329 Mont. 180, 122 P.3d 1239. The party challenging the statute carries the burden of proving the statute’s unconstitutionality beyond a reasonable doubt. In re Custody and Parenting Rights of D.S., ¶ 15. We resolve any doubt in favor of the statute. State v. Michaud, 2008 MT 88, ¶ 15, 342 Mont. 244, 180 P.3d 636.
¶60 Maniaci argues that In re Parenting of J.N.P., 2001 MT 120, 305 Mont. 351, 27 P.3d 953, decided two years after the 1999 amendments, implicitly rejected their constitutionality. We disagree. In J.N.P., Tammy Lynn Knopp (Tammy), a natural mother, left her child temporarily with her aunt and uncle (Knopps) to allow her to find employment and a place to live. The uncle prepared a document entitled “temporary guardianship.” J.N.P., ¶¶ 5-6. The document *527 purported to authorize the Knopps to seek medical attention for J.N.P. if it became necessary. Tammy signed the document. J.N.P., ¶ 5.
¶61 The Knopps filed a petition for a parenting plan and child support for J.N.P. after caring for her for slightly more than two months. J.N.P., ¶ 6. The petition actually sought designation of the Knopps as custodian of the child, sought an order that the child reside with Knopps, and sought to limit Tammy to restricted and supervised visitation. J.N.P., ¶ 6. As noted by the Court, “the Knopps’ petition was the functional equivalent of a petition for custody of J.N.P.” J.N.P., ¶ 6. The Knopps also applied for temporary custody on an ex parte basis. The court granted their request. J.N.P., ¶ 7.
¶62 Tammy moved to terminate the guardianship and restore her parental rights. J.N.P., ¶ 8. She argued that her parental rights could not be terminated absent a Title 41 proceeding. J.N.P., ¶ 9. Although the Knopps relied upon the ‘best interest” standard in § 40-4-212, MCA, they sought actual custody of J.N.P., as opposed to a parental interest. J.N.P., ¶¶ 6, 10. The court concluded that the law does not permit the destruction of a natural parent’s fundamental right to custody of her child based solely upon the child’s best interest. J.N.P., ¶ 26.
¶63 Maniaci contends that the Court must have assumed the existence of a child-parent relationship in J.N.P. because Tammy had left the child in the Knopps’s exclusive custody. The Knopps could not rely upon the nonparental statutes in seeking custody of J.N.P., however, in light of their failure to comply with the statutory pre-requisites of first establishing a child-parent relationship through a petition filed under §40-4-211, MCA. In re Parenting of D.A.H., 2005 MT 68, ¶ 9, 326 Mont. 296, 109 P.3d 247. The Court in D.A.H. refused to allow grandparents seeking custody to sidestep this statutory pre-requisite and the Court in J.N.P. also refused. J.N.P., ¶¶ 22-23. The Court determined that it could not deny Tammy custody absent termination of her parental rights pursuant to a Title 41 proceeding. J.N.P., ¶ 25.
Troxel Standard
¶64 Maniaci further claims that the United States Supreme Court rejected a similar statutory scheme in Troxel v. Granville, 530 U.S. 57, 120 S. Ct. 2054 (2000). In Troxel, two children were born to a couple out of wedlock. Troxel, 530 U.S. at 60, 120 S. Ct. at 2057. The children’s parents separated and their father lived with his parents, Jenifer and Gary Troxel (Troxels). The Troxels’ son regularly brought their grandchildren to the Troxels’ home for weekend visitation. Troxel, 530 U.S. at 60, 120 S. Ct. at 2057.
*528 ¶65 Tommie Granville (Granville), the children’s mother, limited the Troxels’ visitation after the suicide death of the Troxel’s son. Troxel, 530 U.S. at 60-61, 120 S. Ct. at 2057. The Troxels petitioned for the right to visit their grandchildren under the Washington statute that provided “any person may petition the court for visitation rights at any time including, but not limited to, custody proceedings. The court may order visitation rights for any person when visitation may serve the best interest of the child whether or not there has been any change of circumstances.” Troxel, 530 U.S. at 61, 120 S. Ct. at 2057-58. The trial court determined that visitation served the children’s best interests. Troxel, 530 U.S. at 61, 120 S. Ct. at 2058.
¶66 The Washington Court of Appeals reversed. Troxel, 530 U.S. at 62, 120 S. Ct. at 2058. It viewed limits on nonparental visitation as being “consistent with the constitutional restrictions on state interference with parents’ fundamental liberty interest in the care, custody, and management of their children.” Troxel, 530 U.S. at 62, 120 S. Ct. at 2058. The Washington Supreme Court agreed that the statute unconstitutionally infringed on the fundamental rights of parents to rear their children. Troxel, 530 U.S. at 63, 120 S. Ct. at 2058.
¶67 The Washington court found two major problems with the statute. The court noted first that the State may interfere in the right of parents to rear their children only to prevent harm or potential harm to the child. The court further noted that the statute sweeps too broadly by allowing “any person” to petition for forced visitation at “any time” with the only requirement being to serve ‘the best interest of the child.” Troxel, 530 U.S. at 63, 120 S. Ct. at 2058-59. The court rejected the notion that the State should be making significant custody decisions “merely because it could make a ‘better’ decision.” Troxel, 530 U.S. at 63, 120 S. Ct. at 2059. The court cited in this regard the fact that the trial court had given no special weight to Granville’s determination of her daughters’ best interests. Troxel, 530 U.S. at 69, 120 S. Ct. at 2062. The United States Supreme Court granted certiorari and affirmed the judgment. Troxel, 530 U.S. at 63, 120 S. Ct. at 2059.
¶68 Maniaci argues that this Court embraced Troxel in Polasek v. Omura, 2006 MT 103, 332 Mont. 157, 136 P.3d 519, and thereby rendered unconstitutional the 1999 amendments to the nonparental statutory framework set forth in § 40-4-211 and 40-4-228, MCA. In Polasek, this Court determined that the Troxel plurality opinion remained consistent with our ‘best interest of the child” standard contained in §40-9-102, MCA. Polasek, ¶ 14. Section 40-9-102, MCA, *529 allows a grandparent reasonable rights to contact with a child. The Court reasoned that Troxel instructs, and our statute requires, a court to determine the fitness of an objecting parent whose parental rights have not been terminated before a court may grant a petition for grandparent contact. Polasek, ¶ 15; §40-9-102(2), MCA. A presumption arises in favor of the parent’s wishes if the parent is fit. Polasek, ¶ 15.
¶69 Maniaci seeks to have this Court extend the parental fitness condition of the grandparent contact statute to §§ 40-4-211 and 40-4-228, MCA. The extension advocated by Maniaci would ignore the different language in the grandparent contact statute and the nonparenting statutes. Section 40-4-228(5), MCA, provides that fit is not necessary for the court to find a natural parent unfit before awarding a parental interest to a third party.” The Supreme Court in Troxel passed on the constitutional question as to whether the Due Process Clause requires all nonparental visitation statutes to include a showing of harm or potential harm to the child as a condition precedent to granting visitation. Troxel, 530 U.S. at 73, 120 S. Ct. at 2064. The Court recognized that most state adjudication in the visitation context occurs on a case-by-case basis. As a result, the Court announced that it “would be hesitant to hold that specific nonparental visitation statutes violate the Due Process Clause as a per se matter.” Troxel, 530 U.S. at 73, 120 S. Ct. at 2064.
¶70 The Washington visitation statute at issue in Troxel allowed anyone to be awarded visitation. Troxel, 530 U.S. at 61, 120 S. Ct. at 2057. Section 40-4-228(2)(b), MCA, provides that a party first must establish a child-parent relationship. Section 40-4-2 ll(4)(b), MCA, authorizes a court to consider visitation only once the party has established a child-parent relationship. Moreover, the 1999 amendments require the court to balance the constitutionally protected rights of both the parents and children in determining the best interests of the child. Section 40-4-227, MCA.
¶71 The Minnesota Supreme Court upheld the constitutionality of a nonparenting statute in SooHoo v. Johnson, 731 N.W.2d 815 (Minn. 2007), similar to the one enacted by the Montana legislature. The Minnesota statute limited the class of people who could petition for visitation to those persons who had resided with the child for two years or more and it further narrowed the class of those who could be awarded visitation to parties who had “established emotional ties creating a parent and child relationship.” SooHoo, 731 N.W.2d at 820. Montana’s nonparental statutes avoid constitutional infirmity under the Troxel standard through the twin thresholds of consideration of the *530 wishes of the natural parent and the need to first establish a child-parent relationship. See also Rubano v. DiCenzo, 759 A.2d 959 (R.I. 2000).
¶72 Maniaci argues that courts in other jurisdictions have applied the Troxel standard in reversing decisions of trial courts in allowing visitation or custody rights to a third party. For example, in Janice M. v. Margaret K., 404 Md. 661, 948 A.2d 73 (Md. 2008), Maryland’s highest appellate court rejected the common law de facto parent doctrine as a basis for awarding visitation rights to a third party. Maryland had no statute similar to Montana’s nonparenting statute, however, that would provide the basis for allowing the visitation. The court cautioned that ‘twjhether the Maryland General Assembly chooses to enact legislation similar to the Minnesota statute at issue in SooHoo is within its prerogative.” Janice M., 404 Md. at 689, 948 A.2d at 89. Montana’s legislature has chosen to enact the nonparenting statutes. Maniaci has failed to carry her burden of proving beyond a reasonable doubt that the statutes she challenges impermissibly infringe on her constitutional right to parent her children. In re Custody and Parenting Rights of D.S., ¶ 15.
¶73 Whether the court properly awarded Kulstad a parental interest.
¶74 The nonparental statutory framework allows a court to award a parental interest to a nonparent who establishes two threshold conditions by clear and convincing evidence. These threshold conditions are that: “(a) the natural parent has engaged in conduct that is contrary to the child-parent relationship; and (b) the nonparent has established with the child a child-parent relationship as defined in 40-4-211, and it is in the best interests of the child to continue that relationship.” Section 40-4-228(2)(a)-(b), MCA. Maniaci contends that Kulstad failed to prove by clear and convincing evidence the mandatory requirements of §40-4-228(2)(a)-(b), MCA.
Conduct Contrary to Child-Parent Relationship
¶75 Maniaci claims that Kulstad failed to demonstrate that Maniaci had engaged in conduct contrary to the child-parent relationship. Maniaci argues that nonparenting statutes limit conduct contrary to the child-parent relationship to instances of abuse or neglect. The State never initiated any abuse or neglect proceedings against Maniaci and Kulstad never made any allegations of abuse or neglect. Section 40-4-228(5), MCA, specifically provides, however, that it ‘is not necessary for the court to find a natural parent unfit before awarding a parental interest to a third party under this section.” Nothing in § 40-4-228, MCA, limits its application to cases of abuse or neglect.
*531 ¶76 The District Court determined that Maniaci had acted contrary to her child-parent relationship when she ceded her exclusive parenting authority to Kulstad. Kulstad functioned in a parental role from the first day that L.M. came to the parties in 2001 through the end of the parties’ relationship. Kulstad similarly functioned in a parental role from the first day that A.M. came to the parties in 2003 through the end of the parties’ relationship. Maniaci repeatedly represented to the home study evaluators, and, in turn, to adoption authorities that she and Kulstad would raise the minor children as a family unit. Maniaci also depicted this same familial environment to the Human Rights Campaign as part of her effort to adopt A.M. The court specifically found that the parties’ relationship placed the children into a family of same-sex parents.
¶77 Maniaci’s testimony that she had “lied” to the home study evaluators and adoption authorities proves unavailing. We recently rejected similar claims by parties seeking to disavow earlier representations made regarding the status of a party’s economic or personal relationship. LeFeber v. Johnson, 2009 MT 188, 351 Mont. 75, 209 P.3d 254, and In re Marriage of Swanner-Renner, 2009 MT 186, 351 Mont. 62, 209 P.3d 238. LeFeber argued that Johnson had been acting as his nominee in purchasing a house and therefore was not entitled to any ownership interest in the house at the end of the parties twenty-year relationship. The district court rejected this claim, in large part, because LeFeber had “overtly engaged in act[s] wholly inconsistent with [Johnson’s] role as an agent or nominee holding bare legal title to the St. Joseph property.” LeFeber, ¶ 28. LeFeber had represented to the Montana Department of Revenue ‘for seven years running” that Johnson was the sole legal owner of the property. LeFeber, ¶ 28. And LeFeber had assured Johnson in a 1999 letter that she had "rights" to the property. LeFeber, ¶ 28. In Swanner-Renner, Renner attempted to refute Swanner’s claim of a common law marriage between them by arguing that he never had intended to enter a marriage during their twelve-year relationship. Numerous earlier claims to the contrary complicated his attempted refutation. Renner had filed several federal tax returns indicating that his status was married, filing separately. Swanner-Renner, ¶ 15. Renner had identified Swanner as his wife in sworn deposition testimony in another case in Montana in 1999. Swanner-Renner, ¶ 15. Renner also had executed several documents for purposes of obtaining benefits from his union in which he represented that Swanner was his wife. Swanner-Renner, ¶ 15.
*532 ¶78 Maniaci represented to home study evaluators and adoption authorities that she and Kulstad would serve as parents to the children. Maniaci relied upon Kulstad’s support of the children’s physical, psychological, and developmental needs. Maniaci further relied upon Kulstad’s financial wherewithal to present a more stable financial picture to adoption authorities. And Kulstad, with Maniaci’s full knowledge and consent, claimed L.M. as a dependent on her tax returns. Kulstad and Maniaci received a financial benefit from this representation to the Internal Revenue Service. Maniaci cannot rewrite the history of the fact that she and Kulstad lived together for more than 10 years and jointly raised the minor children in the same household. The District Court has discretionary authority to determine that a parent acted contrary to her child-parent relationship when substantial credible evidence supports its findings. Toavs, ¶ 7. Substantial credible evidence in the record supports the District Court’s determination that Maniaci repeatedly and continually acted contrary to her child-parent relationship.
In Loco Parentis
¶79 Section 40-4-211(6), MCA, provides that a “child-parent relationship” includes a relationship that existed, in whole or in part, before the filing of a parenting plan action. The party seeking to establish this relationship first must demonstrate that she provided for the physical needs of the child by supplying food, shelter, and clothing. Section 40-4-211(6), MCA. The party further must demonstrate that she provided the child with the necessary care, education, and discipline on a day-to-day basis ‘through interaction, companionship, interplay, and mutuality that fulfill the child’s psychological needs for a parent as well as the child’s physical needs.” Section 40-4-211(6), MCA.
¶80 The District Court determined that Kulstad had met these criteria through the fact that Maniaci “consented to and fostered the parent-like relationship between Ms. Kulstad and the children.” The court pointed specifically to the facts that Kulstad and the children lived together in the same household and that Kulstad had participated without restriction in their daily lives as a co-parent. The court further noted that Kulstad had assumed significant financial obligations of parenthood without expectation of financial compensation. Finally, the court found that Kulstad had served in this parental role for a sufficient length of time to have established with the children “a bonded, dependent relationship parental in nature.”
*533 ¶81 Maniaci contends that Kulstad had to demonstrate that Maniaci voluntarily had permitted her children to remain continuously in the exclusive care of Kulstad for a significant period of time in order for Kulstad to have established a child-parent relationship. Maniaci argues, in fact, that Kulstad needed to demonstrate that she stood in loco parentis to Maniaci’s children to satisfy the requirement of §40-4-228(4), MCA. Maniaci argues that this Court consistently has interpreted in loco parentis to mean a person who acts as a parent to the exclusion of the natural parent.
¶82 Maniaci argues that Kulstad’s failure to demonstrate that she “stood in place of’ Maniaci as parent to the minor children renders irrelevant the question of whether Kulstad had established a child-parent relationship. Maniaci cites to Peterson v. Kabrich, 213 Mont. 401, 691 P.2d 1360 (1984), and Niemen v. Howell, 234 Mont. 471, 764 P.2d 854 (1988), to support her claim that this Court has recognized in loco parentis status only when a party stands in place of the natural parent. Both cases focus on whether monetary transfers between adult relatives should be treated as gifts or loans. Both cases discuss in loco parentis status only incidentally to the main analysis. And neither case restricts in loco parentis status to a nonparent serving as a parent to a child to the exclusion of the natural parent.
¶83 The widow of the adult nephew in Peterson claimed that certain monetary transfers made by the aunt to the adult nephew had been gifts and thus should not be subject to repayment. The widow claimed that an in loco parentis status existed between the aunt and her adult nephew in order to support a presumption that the aunt had intended the transfers to be gifts. The Court rejected this claim where the evidence indicated that the relationship had been limited “to occasional visits and the exchange of letters and Christmas gifts.” Peterson, 213 Mont. at 408, 691 P.2d at 1364. The Court noted that in order to stand in loco parentis to another, “a person must intentionally assume the status of a parent by accepting those responsibilities and obligations incident to the parental relationship without benefit of legal adoption.” Peterson, 213 Mont. at 408, 691 P.2d at 1364. The Court made no mention of whether the acceptance of these responsibilities and obligations must be to the exclusion of a natural parent. In any event, the aunt had not accepted those responsibilities and obligations through the exchange of letters and Christmas cards and hosting the adult nephew on occasional visits.
¶84 Similarly, in Niemen, a surviving widow claimed that the stepfather of her deceased husband had assumed in loco parentis status as *534 part of her effort to avoid repaying substantial amounts of money advanced by the step-father. The widow argued that the step-father had “accepted responsibilities and obligations incident to the parental relationship.” Niemen, 234 Mont. at 475, 764 P.2d at 856. The Court rejected this claim on the grounds that “no evidence in the record [ ] establishes this fact ’’ Niemen, 234 Mont. at 475, 764 P.2d at 856. The Court cited the “close and loving relationship” between the step-father and the adult child as a reason for the step-father advancing payments to the adult son, including gifts and loans, but concluded that the evidence failed to establish that the step-father had assumed the role of parent for the adult child. Niemen, 234 Mont. at 475, 764 P.2d at 856. We rejected a similar claim of in loco parentis status between a decedent and adult claiming to have been adopted as an adult in In re Estate of Bovey, 2006 MT 46, ¶ 18, 331 Mont. 254, 132 P.3d 510.
¶85 Here Kulstad and Maniaci served as parents for young children entirely dependent on them for their care and well being. The District Court entered findings that established that Kulstad had accepted responsibilities and obligations incident to the parental relationship. Maniaci argues nevertheless that § 40-4-228(4), MCA, limits in loco parentis status to a situation where the natural parent steps aside and allows another person to remain continuously in the care of another for a significant period of time to the exclusion of the natural parent.
¶86 We note first that § 40-4-228(4), MCA, provides merely one example of how a natural parent’s conduct may be contrary to the child-parent relationship. Nothing in §40-4-228(4), MCA, makes any mention of the requirement that the person acting in loco parentis does so to the exclusion of the natural parent. None of the decisions of this Court have defined in loco parentis status to require a third party acting as a parent to the exclusion of the natural parent. We decline to read this requirement into §40-4-228(4), MCA.
¶87 The District Court also relied in part on the common law doctrine of de facto parenting to support its conclusion that Kulstad had standing to commence this proceeding. We need not rely upon the de facto parenting doctrine in light of the legislature’s decision to amend the parenting statutes to allow for a parental interest to be awarded to a party who could establish a child-parent relationship with the child when the natural parent had engaged in conduct contrary to the child-parent relationship. Section 40-4-228(2)(a)-(b), MCA. The District Court found that continuing Kulstad’s relationship with the minor children would be in the children’s best interests and *535 substantial evidence in the record supports the District Court’s finding.
Clear and Convincing Evidence of Child-Parent Relationship
¶88 Maniaci further contends that, even assuming for the sake of argument that Kulstad stood in loco parentis to the minor children, Kulstad still failed to prove by clear and convincing evidence that she had established a child-parent relationship. Maniaci argues that §40-4-211(6), MCA, required Kulstad to have provided for the physical and psychological needs of the children before she filed the lawsuit. Maniaci urges the Court to look at the alleged relationship between Kulstad and the children before Kulstad commenced this action.
¶89 Maniaci disparages as self-serving Kulstad’s testimony regarding the history of her child-parent relationship. Maniaci claims that Dr. Silverman “could only attribute some semblance of a relationship” between Kulstad and the children “as far back as six months before [Kulstad] filed her lawsuit-a time when litigation was imminent, and after the time that [Kulstad] attempted to get Dr. Maniaci to enter into a written agreement about custody.” Maniaci further argues that only she brought forward witnesses who could attest to the nature of Kulstad’s relationship with the children.
¶90 A district court sits in the best position to observe and judge witness credibility and we will not second guess its determination regarding the strength and weight of conflicting testimony. In re Marriage of Horton, 2004 MT 353, ¶ 19, 324 Mont. 382, 102 P.3d 1276. The District Court received and heard testimony from numerous witnesses, including mental health professionals, the children’s therapists, and the court appointed GAL. This evidence and testimony allowed it to determine that Kulstad had established a child-parent relationship with the minor children. This evidence and testimony further allowed the court to evaluate whether it was in the children’s best interest to maintain that child-parent relationship.
¶91 The court acknowledged that the adoption allowed Maniaci to be the exclusive legal parent. The court recognized, however, that Maniaci’s actions from the time that the children entered the home had been entirely inconsistent with an exclusive child-parent relationship. Kulstad, with Maniaci’s consent, served in a parental role for a length of time sufficient to establish a bonded, dependent relationship with the minor children. Kulstad functioned in a parental role from the first day that each of the minor children came to the parties through the end of the parties’ relationship. Dr. Silverman testified that the children and Kulstad had established and maintained *536 a child-parent relationship. Dr. Silverman and Dr. Miller testified that the children would suffer irreparable harm should the court deny parenting time to Kulstad. The record supports the court’s decision to award Kulstad a parental interest in the minor children. In re Bradshaw, ¶ 11.
¶92 Whether the court properly awarded Kulstad personal property and a property interest in the parties’ home.
¶93 The court applied equitable principles in dividing the personal and real property between the parties. We have approved a district court’s application of equitable doctrines in dividing the property of unmarried cohabitants in Anderson v. Woodward, 2009 MT 144, 350 Mont. 343, 207 P.3d 329, and LeFeber.
¶94 We determined in Anderson that the district court correctly had applied equitable principles to distribute two real estate properties that the parties had accumulated during their eight-year relationship. Anderson, ¶ 16. The district court in LeFeber properly used equitable doctrines to divide property that LeFeber had purchased and Johnson had improved. LeFeber, ¶ 23. Johnson’s improvements included finishing the basement, building a deck, installing flooring, fencing the yard, constructing a greenhouse, and installing almost all of the landscaping on the property. LeFeber, ¶ 14. The district court had the power to make compensatory adjustments between the respective parties “according to the ordinary principles of equity.” LeFeber, ¶ 21; Anderson, ¶ 16. We described the approach used to divide the property as being “similar to that used to divide a marital estate in a dissolution action.” LeFeber, ¶ 22. We also noted that the court ‘has great flexibility in fashioning appropriate relief for the parties.” LeFeber, ¶ 22.
¶95 Similarly in Flood v. Kalinyaprak, 2004 MT 15, ¶¶ 26-27, 319 Mont. 280, 84 P.3d 27, the district court correctly applied equitable doctrines in dividing the assets of an unmarried couple. In Flood, the unmarried couple disputed the distribution of property that they had acquired during their relationship. Flood, ¶¶ 10-11. Flood instituted a partition action after the relationship had ended and brought additional claims, including unjust enrichment and constructive trust. Flood, ¶ 11.
¶96 Maniaci purchased the real property and paid for the initial property improvements. Kulstad contributed her money and labor to complete the construction of the house and improvements to the real property. The court determined that Kulstad’s testimony and evidence entitled her to an equitable and fair award of $101,824.43. The court *537 also allowed an equitable award of the Kia Sportage automobile for Kulstad’s significant contributions of labor in improving the property. The District Court properly used equitable doctrines to divide the parties’ personal and real property. LeFeber, ¶ 23; Anderson, ¶ 16; Flood, ¶¶ 26-27. The District Court had “great flexibility”in fashioning appropriate relief for Kulstad and Maniaci using the ordinary principles of equity. LeFeber, ¶ 23; Anderson, ¶ 16; Flood, ¶ 20.
¶97 Affirmed.
CHIEF JUSTICE McGRATH, JUSTICES NELSON, WARNER, LEAPHART and COTTER concur.