DA 13-0523

IN THE SUPREME COURT OF THE STATE OF MONTANA

2014 MT 40

IN RE THE PARENTING OF

S.J.H. and J.B.H.,

      Minor Children.

JAMES E. HANSEN,

      Petitioner and Appellee,

   v.

ROBYN MOATS,

      Respondent and Appellant.

| | |
|---|---|
| APPEAL FROM: | District Court of the Thirteenth Judicial District, In and For the County of Yellowstone, Cause No. DR 10-169 Honorable Ingrid G. Gustafson, Presiding Judge |

COUNSEL OF RECORD:

      For Appellant:

            Jeannette E. Berry, Montana Legal Services Association, Bozeman, Montana

      For Appellee:

            Steven A. Hanson, Hanson Law Office, Billings, Montana

Submitted on Briefs: January 15, 2014
Decided: February 18, 2014

Filed:

_____
Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1      Robyn Moats (Moats), the maternal grandmother of S.J.H. and J.B.H., appeals an order of the Montana Thirteenth Judicial District Court, granting their natural father, James Hansen (Hansen), exclusive parental control of the children.   The dispositive issue on appeal is whether the District Court erred when it determined that Moats did not establish, by clear and convincing evidence, a child-parent relationship with her grandchildren.

¶2      We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶3      Hansen and Brandi Moats (Brandi) began dating while in high school.  They had a tumultuous relationship, and Hansen allegedly engaged in occasional violent and unpredictable behavior that resulted in a series of orders of protection against him.  The District Court issued the first Permanent Order of Protection against Hansen on behalf of Moats and Brandi, effective through October 20, 2005, after an incident in 2004 when Hansen allegedly struck Brandi and shoved Moats while he was intoxicated.  Around the same time, Hansen's mother obtained a Permanent Order of Protection against Moats "to prevent [Moats] from interfering with [her] raising of [Hansen] . . . ."  Hansen's mother alleged that Moats "would buy [Hansen and Brandi] alcohol, she would get [Hansen] out of school, she would call into the school and say he was at home, that she was his mother. It got to the point it was absolutely ridiculous."

2

¶4     S.J.H. was born after Brandi graduated from high school in the spring of 2006. Hansen and Brandi married in 2007, and Hansen joined the Army shortly afterward. The couple lived together at Fort Drum, New York, then at Fort Lewis, Washington.

¶5     Hansen and Brandi separated over the Thanksgiving holiday in 2009, while Brandi was pregnant with their second child. Hansen allegedly became angry, pulled a gun, and threatened Brandi. She obtained a second Order of Protection against Hansen after this incident. J.B.H. was born a few months later. Brandi filed for divorce in February 2010. Following a half-day trial at which both parties appeared and gave sworn testimony, the District Court entered Findings of Fact, Conclusions of Law and a Final Decree on May 25, 2012. The Final Decree of Dissolution provided that the two children would reside permanently with Brandi. Because of Hansen's history of domestic violence, the court permitted him only supervised contact with his children pending completion of a court-services investigation. Hansen never completed the evaluation and exercised his supervised visitation right just a few times.

¶6     Brandi died on April 18, 2013, in a fire at a home in which she did not reside; the children were not present. Immediately following Brandi's death, Moats took control of the children and refused Hansen's attempts to contact them. A few days later, on April 22, 2013, Moats filed another petition for a Temporary Restraining Order against Hansen. The District Court granted the petition "in part to attempt to calm a volatile situation, to avoid potential additional trauma to the children and permit Brandi's family opportunity to have a funeral without the chaos of a custody dispute."

¶7 Hansen filed a petition for exclusive parental control and Moats filed guardianship proceedings; the District Court consolidated both actions into Hansen and Brandi's dissolution action. By the time the matter went to trial, Moats had changed her request for guardianship to a request to be awarded a parental interest and for a parenting plan consistent with that interest. At trial, Hansen denied committing the violent actions alleged in the petitions to obtain any of the protective orders against him. The District Court entered an order granting Hansen sole custody of both children.

## STANDARD OF REVIEW

¶8 This Court reviews a district court's interpretation and application of statutes for correctness and findings of fact to determine whether the findings are clearly erroneous. *In re A.P.P.*, 2011 MT 50, ¶ 7, 359 Mont. 386, 251 P.3d 127 (citing *Kulstad v. Maniaci*, 2009 MT 326, ¶¶ 50-52, 352 Mont. 513, 220 P.3d 595). "A finding is clearly erroneous if it is not supported by substantial credible evidence, if the trial court misapprehended the effect of the evidence, or if a review of the evidence leaves this Court with a definite and firm conviction that a mistake has been made." *Puccinelli v. Puccinelli*, 2012 MT 46, ¶ 13, 364 Mont. 235, 272 P.3d 117. "We confine our review to the determination of whether substantial credible evidence supports the findings actually made by the district court." *A.P.P.*, ¶ 7.

## DISCUSSION

¶9 *Whether the District Court erred when it determined that Moats did not establish a child-parent relationship with her grandchildren.*

4

¶10 To award a parental interest to a person other than a natural parent, the person must show by clear and convincing evidence that "the natural parent has engaged in conduct that is contrary to the child-parent relationship[,] the nonparent has established with the child a child-parent relationship, as defined in 40-4-211, and it is in the best interests of the child to continue that relationship." Section 40-4-228(2), MCA.

¶11 A "child-parent relationship" is defined as a relationship that:

> (a) exists or did exist, in whole or in part, preceding the filing of an action under this section, in which a person provides or provided for the physical needs of a child by supplying food, shelter, and clothing and provides or provided the child with necessary care, education, and discipline;
> (b) continues or existed on a day-to-day basis through interaction, companionship, interplay, and mutuality that fulfill the child's psychological needs for a parent as well as the child's physical needs; and
> (c) meets or met the child's need for continuity of care by providing permanency or stability in residence, schooling, and activities outside of the home.

Section 40-4-211(6), MCA.

¶12 We have considered the application of this statute on only a few occasions. Recently, we held that non-natural parents had asserted facts that could establish a "child-parent relationship" where the couple cared for the child almost full-time for seven years and provided food, shelter, clothing, and a stable home. *In re M.M.G.*, 2012 MT 228, ¶ 13, 366 Mont. 386, 287 P.3d 952. They also enrolled the child in school, helped her with homework, and attended her parent-teacher conferences and school plays. *M.M.G.*, ¶ 13. We affirmed in another case a district court's finding that a child-parent relationship existed where "the evidence established [that the non-natural parent] has

been a primary caretaker of each of the three children since their births." *In re L.F.A.*, 2009 MT 363, ¶ 17, 353 Mont. 220, 220 P.3d 391.

¶13 In *Kulstad*, ¶¶ 80-85, we upheld a finding of a child-parent relationship where the non-natural parent jointly had served with the natural mother "as parents for young children entirely dependent on them for their care and well being[,]" living together in the same household, assuming significant financial obligations of parenthood, and serving in a parental role "for a sufficient length of time to have established with the children 'a bonded, dependent relationship parental in nature.'" We upheld a finding that a step-father established a child-parent relationship based on similar evidence in *In re A.P.P.*, ¶ 20.

¶14 In defining a child-parent relationship, § 40-4-211(6), MCA, imposes a lengthy list of conjunctive factors that all must be proven by clear and convincing evidence. Despite Moats's efforts to establish that she "willingly accepted and performed the responsibilities and obligations of co-parenting with her daughter," however, the District Court determined that Moats's relationship with S.J.H. and J.B.H. was that of an involved grandmother, not a parent. The record supports this conclusion.

¶15 Unlike the facts that were found persuasive in *M.M.G.* or *L.F.A.*, the District Court here determined that Moats's care was sporadic, and that her presence had been even a disruptive factor in the family's life. The court found that Hansen and Brandi's relationship was "negatively impacted by [Moats's] interference or involvement." She did not provide care to S.J.H. during the time he lived in New York or Washington. The

6

court provided the following analysis of Moats's claim that she established a child-parent relationship:

> [Moats's] assertion is not persuasive. Brandi qualified for a housing voucher which paid all but $47 of the rent. Brandi received HRDC assistance for child care. Brandi received food stamps for her and the children. [Moats's] Social Security disability income of approximately $800 per month is her sole source of income and was used primarily for her own support. Without Brandi and the public assistance support she received, [Moats] would have likely had a difficult time providing for herself. While [Moats] no doubt provided some babysitting and assistance to Brandi, it was as a caring grandmother[,] not [as] a parent.

¶16 The court ultimately found that, while "[Moats] has a strong grandparent bond with [S.J.H. and J.B.H.], [she] has not established a parent-child relationship between her and [S.J.H.] or her and [J.B.H.]." Although Moats submitted evidence to show that she attended the children's medical appointments, took them to school and day care, and stepped in when Hansen was not present, the testimony revealed significant conflicts that the District Court was in the best position to resolve. "We view the evidence in the light most favorable to the prevailing party" and "do not consider whether evidence supports findings that are different from those made by the district court." As oft-repeated in matters of child custody, "the trial court determines the credibility of witnesses and the weight assigned to their respective testimony." *A.P.P.*, ¶ 7.

¶17 Because all elements of the statute must be met by clear and convincing evidence for a person other than a natural parent to be awarded a parental interest, we decline to address Moats's arguments under the other elements of § 40-4-228(2), MCA. In particular, without proof of a child-parent relationship, a court need not proceed to determine whether the natural parent engaged in conduct that is contrary to the

child-parent relationship. This Court recognizes the District Court's findings in the dissolution action regarding Hansen's history of domestic violence. The District Court expressed its concern that "there is potential for James to model inappropriate behavior to his children." Section 40-4-212, MCA, explaining the "best interests of the child" standard, provides, "(1) The court shall determine the parenting plan in accordance with the best interest of the child. The court shall consider all relevant parenting factors, which may include but are not limited to: . . . (f) physical abuse or threat of physical abuse by one parent against the other parent or the child." This factor, and others listed in the statute, are for a court to consider when allocating arrangements between parents or persons who have a proven parent-child relationship. Without that relationship, another person may not ask the court to restrict a natural parent's rights in a civil parenting proceeding.

**CONCLUSION**

¶18 The District Court in this case, having observed the legal interactions between Hansen and Brandi since their first order of protection in 2005, was very familiar with the parties and the issues in this matter. Its decision is supported by substantial, credible evidence and we defer to its findings. Because Moats did not seek an award of visitation rights in the alternative to a parental interest, we do not consider the applicability of § 40-4-228(3), MCA, to this action. *See A.P.P.*, ¶ 21. The record does, however, support the District Court's observation of the strong bond between Moats and the children. We concur with its recommendation that Hansen work with Moats to maintain that relationship.

¶19 The District Court's July 22, 2013 order granting exclusive parental control and authority over S.J.H. and J.B.H. to Hansen is affirmed.

/S/ BETH BAKER

We concur:

/S/ PATRICIA COTTER
/S/ LAURIE McKINNON
/S/ MICHAEL E WHEAT
/S/ JIM RICE